(comment: 1)

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-04-413-CR

LOUIS EARL GOODMAN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I. Introduction

A jury convicted Appellant Louis Earl Goodman of manslaughter and assessed his punishment at eighteen years’ confinement.  In three issues, Appellant contends:  (1) the trial court erred by failing to submit the lesser included offense of criminally negligent homicide to the jury; (2) a fatal variance exists between the indictment and the proof at trial; and (3) the evidence is insufficient to support his conviction.  We affirm.

II. Background

On November 25, 2003, Appellant, Ted Garland, Henry Quinten Clay, and Shawn Davis were working the evening shift on a gas drilling rig in Denton County, Texas.  Appellant, as the driller, was in charge of the crew that evening because Lonnie Lavergne, the “tool pusher,” was not at the site.  At about 8:00 p.m., Clay went into the top doghouse
(footnote: 1) where Appellant, Garland, and Davis were sitting around and talking.  At some point, the conversation turned to initiating Davis since he was a new member of the crew.
(footnote: 2)  Several initiation techniques were mentioned, including hoisting Davis up with either the “cat line” or the “boom line.”  A “cat line” consists of a rope, a cable, and a chain with a hook on it.  One end of the rope is wrapped around the cathead for traction, and the other end of the rope is attached to the cable that runs through a shiv on the derrick.  The cable is then attached to the chain, which is wrapped around whatever needs to be lifted.  Generally, a cat line is used to pick up pipe and put it in the “mousehole” on the rig floor.
(footnote: 3)  

After Clay had gone downstairs, Appellant and Garland suggested to Davis that they put a derrick belt on him.  A derrick belt is a belt or harness that a crew member wears to help him climb the derrick.  In the front of the belt are two “D-rings,” or pieces of metal woven into the belt, where a chain attaches. Davis replied that he did not want to put a belt on and that they would have to put it on him.  The three men wrestled, and Appellant and Garland succeeded in putting the belt on Davis.  Appellant then retrieved the cat line.  

Clay was making his way back up the stairs when he saw Appellant walking into the top doghouse with the chain end of the cat line.  Clay testified that he began shaking his head because he thought that “wasn’t very smart.” He stated that the kelly, the device located on the rig floor that is used to drill into the ground and rotates at seventy rounds per minute, was turning and, based on his experience, he knew that any slack in the cat line could get caught on the kelly as it turned.  Clay saw the end of the cat line going up the backside of the derrick, indicating that it either had slack in it and the weight of the chain on the cable was pulling it up or that it had gotten caught in something.  Clay then saw that the chain part of the cat line was tight and was being pulled in reverse out of the top doghouse; therefore, he knew that the cat line was wrapping around the kelly. 

Meanwhile, inside of the top doghouse, Appellant hooked the cat line onto the belt Davis was wearing and said, “I got you.”  Without taking his hand off the cat line, Appellant immediately tried to unhook it.  However, Appellant stated that he felt something start to pull the cat line, and he was unable to unhook the cat line as it pulled Davis out of the door of the top doghouse. 

Clay saw Davis being dragged, face first, out of the building.  Clay testified that Davis hit the bottom half of the doghouse door, taking it off the hinges.  Davis was then dragged to the kelly bushing where he was spun around approximately ten to twenty times as his body hit several different pieces of equipment and surfaces.  Clay testified that Davis was getting beaten to death; therefore, he yelled for Appellant so that Appellant would shut down the equipment.  Appellant shut down the rotary table, and Clay “kicked the pumps out” to stop the rotary table from spinning backwards.  

Appellant, Garland, and Clay checked on Davis.  Appellant tried to use the company rig phone to call 911, but the phone would not work.  Clay went to his truck, called 911 on his cell phone, and drove to a convenience store to meet the ambulance.  While Clay was gone, Appellant removed the belt from Davis and hung it back up in the top doghouse.  Clay returned to the rig with the ambulance.  The paramedics checked Davis for a pulse, but he was dead. 

While they waited for the police officers to arrive, Appellant, Garland, and Clay talked about what had happened.  Clay testified that Appellant wanted him to tell the police officers that the cat line had come loose from a pipe, that Davis was then showing the cat line to Appellant, and that Davis accidentally got too close to the kelly, causing the cat line to wrap around it.  When Troy Mac Hohenberger, the fire chief for the Argyle Fire District and a paramedic, arrived on the scene, Appellant told him this story five or six times.  Additionally, when Appellant spoke with Deputy David Brawner that night about how Davis had died, he told Deputy Brawner a similar story. 

In Clay’s written statement that he gave to the police that night, he simply wrote down what he had seen—that he had seen Davis getting wrapped up in the kelly.  He testified that he did not put everything in the statement because Garland was standing right behind him when he wrote it.  The following morning, however, Clay called Investigator Don Britt of the Denton County Sheriff’s Office.  Investigator Britt testified that based on his conversation with Clay that morning, he was no longer looking at the incident as an accident.   

After obtaining the owner’s permission to go back out to the drilling rig, Investigator Britt, Investigator Larry Kish, and Lieutenant Terry Kimbell returned to the scene.  They collected several belts that were hanging on a hook inside the top doghouse.  Investigator Britt also located both halves of the top doghouse door that had been taken off the doghouse and placed behind a shed.  Investigator Britt noticed that on one of the door halves, the hinge was bent off and there was blood on it.  Carolyn Van Winkle, a senior DNA analyst with the Tarrant County Medical Examiner’s Office, later testified that the blood on the belt was a “positive match” to Davis’s blood and that it was “highly likely” that the blood on the door was Davis’s blood. 

While the officers were investigating at the drilling rig, Appellant arrived for work.  Investigator Britt asked Appellant to come to the sheriff’s office with him so that he could interview Appellant about what happened.  Appellant agreed to do so.  When they first arrived at Investigator Britt’s office, Appellant related the same story to Investigator Britt that he had told the law enforcement officers on the previous night.  Investigator Britt told Appellant that they had reason to believe the incident happened differently than Appellant’s story.  Appellant then gave the following statement, which Investigator Britt typed as Appellant related the facts to him:

All four of us was in the dog house talking about Thanksgiving:  me, Quintin, Ted and Shawn.  Quintin left, down onto the ground, to do some work.  The three of us was sitting in there drinking coke and coffe [sic], talking.

Ted said something about initiating Shawn.  He was the new hand on the crew.  It is something that normally happens with the new guy.  I said we were too far away from the pits.  Normally we would throw someone in the pit for initiation.  We said we would put the derrick belt on Shawn.  Me and Ted put it on him.  We wrestled around, getting it on him.  We sat around for about 15-20 minutes afterward, smoking cigarettes.

I said I would just hook a chain on him.  Then Ted said, “No, grab the catline.”  The catline is a cable that picks up pipe and puts it in the mouse hole.  It was outside.  I brung it through the door.  I hooked it on Shawn, on the derrick belt.  As I reached down to take it off, it was too late.  The cat line got wrapped around the kelly.  It is a bushing that is always turning.  It drug both of us out the door.

Shawn was pulled through the door.  I run over and started kicking everything out of gear.  It stopped.  I rolled him over and tried to get all the cable off to see if I could help him.  I tried to dial 9-11 but it wouldn’t work.  Quintin ran down and got his phone and dialed 911.

I took the belt off him, trying to help him.
(footnote: 4) 

III. Lesser Included Offense

In his first issue, Appellant contends that 
the trial court erred by failing to submit the lesser included offense of criminally negligent homicide to the jury
.  We disagree.

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser included offense.  
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993)
; 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  First, the lesser included offense must be included within the proof necessary to establish the offense charged.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  This means that the offense must come within the dictates of article 37.09 of the Texas Code of Criminal Procedure.  
Tex. Code Crim. Proc. Ann.
 art. 37.09 (Vernon 1981); 
Moore v. State
, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).
  
“An offense is a lesser included offense if . . . it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission.”  
Tex. Code Crim. Proc. Ann
. art. 37.09(3).

Second, some evidence must exist in the record that would permit a jury to rationally find that if Appellant is guilty, he is guilty only of the lesser offense.  
Salinas
, 163 S.W.3d at 741; 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  The evidence must be evaluated in the context of the entire record.  
Moore
, 969 S.W.2d at 8.  There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser included offense.  
Id.
  The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence.  
Id.
  If there is evidence from any source that negates or refutes the element establishing the greater offense, or if the evidence is so weak that it is subject to more than one reasonable inference regarding the aggravating element, the jury should be charged on the lesser included offense.  
See Schweinle v. State
, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996); 
Saunders v. State
, 840 S.W.2d 390, 391-92 (Tex. Crim. App. 1992).

The State does not challenge Appellant’s contention that criminally negligent homicide is a lesser included offense of manslaughter.  
See Stadt v. State
, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005); 
Aliff v. State
, 627 S.W.2d 166, 171 (Tex. Crim. App. 1982).
  The issue here is whether there is some evidence in the record that would permit a jury to rationally find that if Appellant is guilty, he is guilty only of the lesser included offense of criminally negligent homicide.
 

A person commits manslaughter if he recklessly causes the death of another.  
Tex. Penal Code Ann.
 § 19.04(a) (Vernon 2003).  Under Texas Penal Code section 6.03(c),

[a] person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.

Id
.
 § 6.03(c).  A person commits criminally negligent homicide if he causes the death of another by criminal negligence.  
Id
.
 § 19.05(a).  Under Texas Penal Code section 6.03(d),

[a] person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor’s standpoint.

Id
. § 6.03(d). 

The difference between criminally negligent homicide and manslaughter is the culpable mental state.  
Stadt
, 182 S.W.3d at 364; 
Aliff
, 627 S.W.2d at 171; 
Lewis v. State
, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975).  The offense of manslaughter “involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards it.”  
Stadt
, 182 S.W.3d at 364 (quoting 
Lewis
, 529 S.W.2d at 553).  On the other hand, the offense of criminally negligent homicide “involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof [but fails] to perceive the risk.”  
Id
. (quoting 
Lewis
, 529 S.W.2d at 553).  Therefore, before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk.  
Mendieta v. State
, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986); 
Licon v. State
, 99 S.W.3d 918, 928 (Tex. App.—El Paso 2003, no pet.); 
Ybarra v. State
, 890 S.W.2d 98, 111 (Tex. App.—San Antonio 1994, pet. ref’d).
 

Here, Appellant supports his contention that he acted with criminal negligence by pointing us to evidence showing that he was unaware that the cat line had tangled when he hooked it to Davis.  The dissent likewise focuses on this evidence.  However, even accepting that fact as true, it does not raise an issue of unawareness of the 
risk
.  

We cannot ignore that Appellant testified that he was the supervisor of the crew of four men that evening and had worked on drilling rigs for approximately twenty-five years. 
 Appellant stated that he began working in the oil field as soon as he was old enough, age eighteen, and had continued to work in the oil field ever since.  Through those years, he had worked as a roustabout, a floor hand, a derrick hand, and a chain hand while working his way up to the position of driller.  Furthermore, during cross-examination, Appellant testified as follows:

Q.  In fact, people have gotten hurt on drilling rigs, haven’t they?

A.  Yes, sir.

Q.  I mean, people have gotten seriously injured, haven’t they?

A.  Yes, sir.

Q.  And some of those injuries that you’re aware of have involved cat lines, right?

A.  A couple of them.

Q.  So -- and you were aware of that.  You knew about that prior to Shawn being killed didn’t you?

A.  Yes, sir.

Q.  So you knew that cat lines were risky business.

A.  Yes, sir.

Q.  You knew that they were dangerous enough that someone could get seriously hurt.

A.  At -- yes, sir.

Q.  I mean, isn’t it even possible -- I mean, in your mind, someone could get killed with a cat line.  You knew that, right?

A.  Yes, sir.

Q.  I mean, cat lines, catheads, they sometimes get, I think the phrase is, fouled up, right?

A.  If you wrap the rope around, yes, sir, it can get fouled up.

Q.  And you knew that?

A.  Yes, sir.  But the rope never did touch it.

Q.  But getting fouled up, was that a possibility?

A.  Not at that time.

Q.  It wasn’t a possibility?

A.  Not at that time.

Q.  You’d seen cat lines get fouled up in the past, hadn’t you?

A.  Yes, sir.

Q.  In fact, there had been a prior incident on that particular rig, hadn’t there?

A.  Yes, sir.

Q.  Where the cat line had gotten tangled up while it was attached to a pipe that was suspended in the air.

A.  Yes, sir.

Q.  And that situation was a situation that you were well aware of going into the night that you hooked Shawn up to that cat line.

A.  That was the night that -- the cat line got fouled up was when the guy was picking it up with the rope around the head.

Q.  And so you knew about that.

A.  Yes, sir.

Q.  Before you put the cat line onto Shawn.

A.  Yes, sir.

Appellant also testified that he still had his hand on the cable after he had hooked it to Davis’s belt because he 
knew
 that it was not something he should have done. 
 This testimony is evidence that Appellant himself was aware of a risk of death involving a cat line.
 

Appellant’s contention that he was entitled to a charge on the lesser-included offense of criminally negligent homicide because he was unaware that the cat line had tangled in this particular instance is misplaced.  The State did not bear the burden to prove that Appellant knew the rope was actually tangling, just that Appellant was aware of the 
risk
.  
See Trepanier v. State
, 940 S.W.2d 827, 829-30 (Tex. App.—Austin 1997, pet. ref’d) (holding evidence legally sufficient to support conviction for manslaughter even if appellant was unaware that a bicyclist was traveling on the shoulder of the highway); 
see also Miller v. State
, No. 01-03-00819-CR, 2005 WL 825762, at *6 (Tex. App.—Houston [1st Dist.] Apr. 7, 2005, pet. ref’d) (not designated for publication) (holding appellant not entitled to instruction on lesser-included offense of criminally negligent homicide because, even though appellant was unaware that the complainant was cycling along the shoulder of the highway, she was aware of the fact that driving along the shoulder of the highway at a speed exceeding the posted limit was dangerous).  In fact, as the State points out, if Appellant had known that the cat line was tangling as he attached it to Davis, Appellant would more likely have been charged with murder for his actions than with manslaughter.  
See 
Tex. Penal Code Ann.
 §§ 6.03(b), 19.02(b)(1).

We find no evidence in the record that would permit a jury to rationally find that Appellant is guilty only of the lesser included offense of criminally negligent homicide.
  We hold that Appellant was not entitled to an instruction on the lesser included offense of criminally negligent homicide and that the trial court did not err in refusing to grant his requested charge. 
 We overrule Appellant’s first issue.

IV. Variance

In his second issue, Appellant contends that the trial court erred in permitting his conviction based on a fatal variance between the indictment and  the proof at trial because the State offered no evidence as to the cause of death as alleged in the indictment.
(footnote: 5)  

A “variance” occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial.  
Gollihar v. State
, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001).  In a variance situation, the State has proven the defendant guilty of a crime, but has proven its commission in a manner that varies from the allegations in the charging instrument.  
Id
.  A variance between the allegations in the charging instrument and the evidence adduced at trial is a sufficiency issue.  
See id
. at 247.  

However, even when viewed as a sufficiency question, a variance claim is subject to an additional materiality analysis which is not required under a traditional sufficiency of the evidence review.  
Id
. at 248 n.7.  Only a material variance will render the evidence insufficient.  
Id
. at 257.  A variance is material if the charging instrument, as written, did not give the defendant adequate notice of the charge against him or if the charging instrument, as written, subjected the defendant to the risk of a second prosecution for the same crime.  
Id
.

In the present case, Appellant contends that the State offered no evidence as to the cause of death as alleged in the indictment, but merely offered several possibilities, such as “hitting the door of the doghouse, the pipe in the mousehole, the covering of the fan gears, the [k]elly drive shaft and others.”  The indictment alleged that Appellant caused Davis’s death by attaching a cable to him and causing him to be pulled by that cable through a door and into a drill pipe drive bushing.  At trial, Appellant admitted that he helped put a derrick belt on Davis, that he retrieved the cat line, and that he attached the cat line to the derrick belt.  In the statement Appellant made to Investigator Britt, he described the cat line as a cable.  Furthermore, Clay testified that the main part of the cat line is the cable; therefore, it would be accurate to describe a cat line as a cable. 

In the statement Appellant made to Investigator Britt, he stated that Appellant was pulled through the top doghouse door by the cat line.  Moreover, both Appellant’s and Clay’s testimony at trial revealed that Davis was dragged out of the top doghouse by the cable, hitting the bottom half of the doghouse door and taking it off the hinges. 

Clay testified that the entire equipment device from the pipe to the kelly to the kelly bushing to the rotary table could accurately be described as a drill pipe drive bushing.  Clay also stated that Davis was dragged to the kelly bushing where he was spun around approximately ten to twenty times as his body hit the pipe slips and the chain guard.  Dr. Marc Krouse, the medical examiner who performed the autopsy on Davis, testified that Davis’s cause of death was blunt force injury of the head, causing a very large depressed skull fracture with significant internal head injuries.  Dr. Krouse also stated that even though he did not know specifically which object caused Davis’s fatal injury, the fatal injury was consistent with being pulling into a rotating kelly bushing and being spun around the drive bushing, as opposed to hitting the top doghouse door.  

In light of the foregoing, we hold that no variance exists as the State presented evidence that the offense was committed in the manner that was alleged in the indictment.  Furthermore, even if a variance exists, the variance was not material.  There is no evidence in the record that Appellant was not given adequate notice of the charge against him, nor does the indictment, as written, subject the defendant to the risk of a second prosecution for the same crime.  Therefore, we overrule Appellant’s second issue.

V. Sufficiency of the Evidence

In his third issue, Appellant contends that the evidence is insufficient to support his conviction because the State failed to prove beyond a reasonable doubt that Appellant acted recklessly.
(footnote: 6)
 In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  
This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar
, 46 S.W.3d at 253; 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.   In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Appellant testified that he had been working on drilling rigs for approximately twenty-five years.  Based on his experience, Appellant agreed that drilling rigs are dangerous, even when everyone is doing exactly what they are supposed to be doing.  Appellant specifically testified that, prior to Davis being killed, he knew that people had been seriously injured on drilling rigs, that some of those injuries involved cat lines, and that it was even possible that someone could be killed with a cat line.  In fact, both Appellant and Clay testified about a prior incident on that particular drilling rig that occurred three to four weeks before Davis was killed where the cat line had “fouled up” or tangled while it was attached to a pipe that was suspended in the air. 

Furthermore, although Appellant contends that he was unaware that the cat line was becoming entangled just before he hooked it onto Davis’s belt, he testified at trial that when he hooked the cat line onto the belt, he never took his hand off it; that when he felt something start pulling on the cat line, he immediately tried to get it undone but could not; and when asked on cross-examination if the reason he was going to unhook it was because he knew that having the cat line hooked to the belt was not something he should be doing, he agreed.  Moreover, after the incident occurred, Appellant removed the belt from Davis and hung it back up in the top doghouse, and when law enforcement officers began arriving at the scene, Appellant repeatedly lied about how the incident occurred.  

Finally, 
Appellant, as the driller, was in charge of the crew that evening because the “tool pusher” was not at the site. 
 J.C. “Bud” Wells, a longtime drilling contractor, testified that he thought a drill operator should know and be aware of the risks associated with the misuse of the drilling equipment, such as the cat line.  In fact, Clay, who had ten to eleven years of experience working on drilling rigs, testified that he was aware of the risks associated with drilling equipment and because of those risks, the crew members would wear hardhats, steel-toed boots, gloves, no jewelry, and no loose clothing. 

After examining the evidence under the applicable legal and factual sufficiency standards of review, we conclude that the jury was rationally justified in finding Appellant acted recklessly. 
 Therefore, we overrule Appellant’s third issue.

VI. Conclusion

Having overruled Appellant’s three issues on appeal, we affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J.; GARDNER and WALKER, JJ.

Walker, J. filed a dissenting opinion.

PUBLISH

DELIVERED: March 30, 2006 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-413-CR

LOUIS EARL GOODMAN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

DISSENTING OPINION

------------

I respectfully dissent.  Because some evidence exists in the record that would permit a jury to rationally find that if Appellant was guilty, he is guilty only of criminally negligent homicide, I would hold that the trial court erred by refusing to submit this lesser included offense to the jury.  Accordingly, I would sustain Appellant’s first issue, reverse the trial court’s judgment, and remand this case for a new trial.

I agree with the majority’s recitation of the law concerning the two-pronged test we apply to determine whether a defendant is entitled to an instruction on a lesser included offense and with the majority’s holding that criminally negligent homicide is a lesser included offense of manslaughter.  
See Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).  I also agree with the majority’s explanation of the legal distinction between criminally negligent homicide and manslaughter, the culpable mental state required.  
See
 
Tex. Penal Code Ann.
 § 19.04(a) (Vernon 2003) (defining manslaughter as recklessly causing the death of another),
 § 19.05(a) (defining criminally negligent homicide as causing the death of another by criminal negligence); 
Stadt v. State
, 182 S.W.3d 360, 363-64 (Tex. Crim. App. 2005).  I cannot agree, however, with the majority that no evidence exists in the record that would permit a jury to rationally find that if Appellant is guilty, he is guilty only of the lesser offense.

The record contains the following testimony, in addition to the testimony recited by the majority.  Drilling rigs are inherently dangerous.  They are dangerous even when everyone is doing exactly what they are supposed to be doing.  The State’s expert, Mr. J.C. Bud Wells, testified that he had over forty-five years of experience in the drilling industry in various capacities.  When asked whether it was common or uncommon for the cat line to get “fouled up,”  Mr. Wells testified that “it is not an everyday occurrence” and that in his forty-five years of experience working rigs, he has known about a half-dozen people who have been injured by the cat line. 

Mr. Wells testified that initiations and horseplay are common on rigs and that  the participants are “not intending to hurt anybody.”  Mr. Wells was asked what types of things would occur if a “new guy” was being initiated.  He responded,

Well, there’s a number of things:  You know, taking a dope brush and doping them up; blindfolding them, letting them take a sledgehammer to hit an X and stick their hard hat under it where they hit their hardhat with a sledgehammer; letting them walk a plank on the pit or something and move the plank out of the way and let them fall in the pit.

Mr. Wells described “doping” as taking the worker’s “britches down and dope them between their legs with pipe dope.”  Appellant likewise testified that it was common practice for new work hands to be initiated on a rig.  Appellant had initiated new workers by “greasing their boots,” “throwing them in the pits,” and “putting them on the cat line.”  In fact, these initiations and “pranks” had likewise been done to Appellant “many times” during his twenty-five years of working on rigs, and he was never injured, except for minor “bumps and bruises.”  Appellant also testified that he had been “picked up a bunch of times” by the cat line “to work on things” on the rig. 

Concerning the incident at issue, Appellant testified that he never took his hand off of the cat line; he hooked it on the derrick belt and attempted to immediately unhook it.  Additionally, Appellant who was in the top doghouse did not have the same vantage point as Clay who was on his way up the stairs to the doghouse when Clay saw that the cat line was wrapping around the kelly.  

Finally, Appellant possessed only a sixth-grade education.  He cannot read or write, except to mark his name. 

Keeping in mind that this court cannot consider whether the above evidence is credible, controverted, or in conflict with other evidence, the evidence recited above refutes the intent element required for the offense of manslaughter, that is recklessness.  
See Schweinle v. State
, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996).  A person acts recklessly with respect to circumstances surrounding his conduct when 

he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances 
as viewed from the actor’s standpoint
.

Tex. Penal Code Ann.
 § 6.03(c) (Vernon 2003)(emphasis added).

Testimony exists that Appellant himself had been hoisted on the cat line “a bunch of times” with only minor bumps and bruises, thus showing that from Appellant’s standpoint, the risk of hooking the cat line to Shawn for a couple of seconds did not constitute a substantial and unjustifiable risk that was a gross deviation from the standard of care that an ordinary rig worker would exercise.  Likewise, Mr. Wells’s testimony—that in forty-five years he was aware of approximately six injuries from the cat line—is evidence that Appellant’s perceived risk from hooking the cat line to Shawn’s derrick belt for a few seconds was not so substantial and unjustifiable that its disregard would constitute a gross deviation from the standard of care that an ordinary rig worker would exercise.  The admittedly pervasive practice on rigs of horseplay and of initiating new workers with physical pranks also refutes the requirement for “recklessness” that viewed from Appellant’s standpoint, by performing the initiation prank here, he consciously disregarded a substantial and unjustifiable risk of Shawn’s death.  The sheer frequency of these “pranks” lessens risk perception from Appellant’s standpoint.  Moreover, the evidence showed that on the day in question, Appellant was not aware that while he was in the top doghouse the cat line was wrapping around the kelly.  Finally, Appellant possessed a sixth-grade education, had no training beyond sixth grade, and had worked on rigs since he was eighteen.  Appellant was steeped in the life and culture of working on a rig that was dangerous even when everyone was doing his job.  Viewed from Appellant’s standpoint, not the standpoint of the judges on this court, the above constitutes some evidence that by hooking the cat line to Shawn’s derrick belt, Appellant did not consciously disregard a substantial and unjustifiable risk, but instead only should have been aware of the risk surrounding his conduct but failed to perceive it.  
See Stadt
, 182 S.W.3d at 364 (holding defendant entitled to instruction on lesser included offense of criminally negligent homicide).

In my view, the majority focuses on evidence of Appellant’s knowledge of the dangerousness of cat lines in general, instead of determining whether evidence exists that Appellant was not, but should have been, aware of the risk of his conduct, viewed from his standpoint, in clipping the cat line on Shawn’s derrick belt for a few seconds.  
See
 
Tex. Penal Code Ann.
 § 6.03(d).  I cannot agree that Appellant’s general knowledge that cat lines are dangerous equates to a specific knowledge by Appellant that by performing the initiation act of clipping the cat line to Shawn’s derrick belt for a few seconds he was consciously disregarding a substantial and unjustifiable risk that the cat line was or would become “fouled up” or that Shawn would be injured or killed.  
See id.

For the reasons set forth above, I dissent. 

SUE WALKER

JUSTICE

DELIVERED:  March 30, 2006

FOOTNOTES
1:
The “top doghouse” is an upstairs building where the drillers change their clothes and take care of necessary paperwork. 

2:
Appellant, Clay, and J.C. “Bud” Wells, a longtime drilling contractor, all testified that initiating new crew members is common on drilling rigs.  Davis had worked with the crew for approximately one week. 

3:
A “boom line” is similar to a cat line except it hangs out over the ground.  Clay testified that Appellant and Garland suggested putting a harness on Davis and stringing him up on the boom line.  Clay said that he thought Appellant was joking and did not want any part of it; therefore, he decided to go downstairs to make some rounds and check on his pumps.  Appellant, on the other hand, testified that he and Garland suggested stringing Davis up with the cat line, not the boom line.  Appellant also stated that Clay had already gone downstairs when the conversation about initiating Davis began. 

4:
Appellant admitted at trial that he lied in this statement when he said that they sat around for about fifteen to twenty minutes after putting the belt on Davis. 

5:
The heading for Appellant’s second issue states that the fatal variance occurred as to the proof of jurisdiction and venue of the alleged offense; however, the substance of Appellant’s argument contains no such contentions.  Because Appellant has failed to argue, cite legal authority, or make specific record references regarding jurisdiction and venue, we overrule the jurisdiction and venue aspect of his second issue as inadequately briefed. 
 Tex. R. App. P.
 38.1(h).

6:
In his brief, Appellant refers to the motion for directed verdict that he made at trial.  A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.  
McDuff v. State
, 939 S.W.2d 607, 613 (Tex. Crim. App.), 
cert. denied
, 522 U.S. 844 (1997); 
Franks v. State
, 90 S.W.3d 771, 789 (Tex. App.—Fort Worth 2002, no pet.).  However, because it appears that Appellant is also challenging the factual sufficiency of the evidence, we will address both the legal and factual sufficiency of the evidence.

COMMENTS AND ANNOTATIONS
Comment 1:
Majority opinion by Justice Gardner

Dissent by Justice Walker