

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00400-CR

Minerva **ALCORTA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR9807
Honorable Melisa Skinner, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  January 31, 2018

AFFIRMED

After finding Appellant Minerva Alcorta guilty of Garry Bean's murder, a Bexar County jury subsequently found Alcorta acted under the immediate influence of sudden passion and assessed punishment at fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $10,000.00 fine.

On appeal, Alcorta contends the trial court erred (1) in failing to include the lesser-included offense of criminally negligent homicide and (2) by sua sponte including a self-defense instruction

in the jury's charge. Alcorta further contends the evidence of intent is insufficient to support the jury's verdict. We affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Several witnesses were called to testify before the jury. Because the issues raised by Alcorta required a review of the entire record, we include a rather lengthy version of the facts.

A. Bexar County Sheriff's Officers and Paramedics

1. Deputy Eric Richards

On November 22, 2013, Bexar County Sheriff's Office Deputy Eric Richards responded to a dispatch call. When Deputy Richards pulled up to the house, he and his partner knocked on the door and Alcorta "opened the door in a frantic state with blood on her hands and her shirt." Alcorta told the officers, "a couple of times, I shot him, I shot him." She then directed the officers to the upstairs bedroom and informed the officers that the weapon was next to Bean.

Deputy Richards collected and secured the firearm; he did not open or manipulate the firearm and did not touch the weapon without the appropriate gloves. The officers located Bean, partially facedown, with the top half of his body inside the closet area, and the bottom half of his body more in the room's living space. The firearm was located approximately three feet from Bean's feet.

Deputy Richards testified that Alcorta had a blunt force trauma wound below her right eye and blood on top of the eye. The deputy noted, however, the blood appeared to be "transfer blood" and not from any injury sustained by Alcorta.

The State introduced several pictures through Deputy Richards, including a picture depicting a chair's location prior to anyone moving anything in the residence. Deputy Richards explained that he noted the location of a wooden chair based on Alcorta's report of Bean using the chair to hold her down. The deputy opined that it was possible the chair was potentially moved a

couple of inches to allow passage into the dining room. In the dining room, Deputy Richards reported evidence of some type of disturbance involving wine bottles in the dining room, but the officers never did establish exactly what transpired. There were three holes in the dining room wall—one wine bottle was still hanging out of the wall and two additional wine bottles were on the floor below the holes in the wall.

### 2. *Barton Brandon*

Paramedic Barton Brandon was dispatched at 1:18 a.m. to Alcorta's address. When Brandon arrived, Bean was breathing and had a pulse. Brandon testified that Bean died while being transported to the ambulance.

### 3. *Deputy Janice Henry*

Deputy Janice Henry of the Bexar County Sheriff's Office testified the "scrapes" on Alcorta's forearms, previously identified by Deputy Richards, were "blood smears." When Deputy Henry examined Alcorta the following morning, there were no visible injuries on Alcorta's forearms. On cross-examination, Deputy Henry explained that she did not photograph Alcorta's forearms because there were no injuries to photograph.

### 4. *Detective Rubin Arevalos*

After first gathering evidence from the hospital, including Bean's clothing and personal items, Bexar County Sheriff's Office Detective Rubin Arevalos proceeded to the residence. Detective Arevalos testified that he remembered seeing a screwdriver located to the right of the chair, but he did not think the screwdriver was marked or collected as evidence. He also remembered seeing a book on the hardwood stairs.

Detective Arevalos took an inventory of the bedroom. The officers located a sawed-off shotgun and a Glock handgun from the dresser in the bedroom. A rifle was located in a different bedroom in the house.

Once downtown, Detective Arevalos spoke to Alcorta. He *Mirandized* her and Alcorta indicated she wished to speak to the officer. She initialed each warning and signed the form.

Alcorta told Detective Arevalos that she and Bean were at a pool tournament with a group of friends. Around 8:00 p.m., the group moved from one pool hall to a second pool hall where they stayed for the remainder of the evening. Bean drank approximately six or seven beers; she drank only one. The argument began when Bean started displaying "bad gamesmanship" toward the other team. On the drive home, Alcorta relayed that Bean was driving fast and the couple continued to argue.

When they arrived home, Alcorta said that she ran straight to the door and tried to lock Bean out. He was yelling from the outside, but he was able to enter the house through the garage. Bean proceeded to drag Alcorta to the garage and lock her outside of the residence. According to Alcorta, Bean was in the house, she was in the garage, and he was no longer threatening her. When Alcorta tried to get back into the house, Bean attempted to force the door closed. During the struggle, Alcorta's arm "got stuck" and Bean "closed the door on her arm." After he slammed the door, Alcorta's crying drew Bean's attention; when he opened the door, she rushed into the house.

Alcorta ran toward the stairs, but claimed Bean grabbed her by her ponytail and prevented her from going up the stairs. She continued that while Bean was pulling her by the ponytail, he hit her from behind. Detective Arevalos testified that Alcorta's description of the incident was confusing because, based on her version of the events, the bruise should have been on the left side of the face, but it was on her right side.

Alcorta told Detective Arevalos that she fell to the wooden floor and Bean came from behind her and pushed the chair on top of her, on "her chest area." Alcorta further claimed that Bean pinned her down and prevented her from moving around. Alcorta said she was on her back,

and the chair was on her neck and arm, with all of Bean's weight on the chair. Alcorta was kicking Bean and Bean lost his balance. Alcorta was able to push the chair, and run up the stairs.

Alcorta was afraid that Bean "might pull a gun on her." Alcorta knew there was a gun in the bedroom because she had hidden it from him several weeks earlier. She was adamant that only she knew the firearm's location. Alcorta denied that Bean had ever pointed the gun at her or threatened her, but admitted that two years before the incident, Bean pushed her.

Bean came in the bedroom and began "going through the drawers, where the guns were." Alcorta claimed they both reached for the firearm, and grabbed it at the same time. Alcorta explained they were both standing; she had the handle of the gun, Bean had the barrel, and they were both tugging at it. Alcorta further explained that as soon as they stepped backward, the gun went off at the same time they released their hands. Alcorta told Detective Arevalos that Bean tripped over the dog bed and was falling backwards and that was why the gun went off. She did not describe it as violent struggle. To the detective, Alcorta's description was more like wrestling; when the gun went off, they both dropped it. Alcorta never told Detective Arevalos that Bean pulled the weapon on her.

Detective Arevalos observed some bruising to the right side of Alcorta's eye and blood on her shirt and hand. He also noticed other small specks of blood on Alcorta's shirt and a scratch on her arm. Detective Arevalos did not see any evidence of injury or trauma on Alcorta's neck. Specifically, Detective Arevalos testified that he did not see any evidence of a chair being depressed against Alcorta's neck, especially with a man's body weight on the chair.

Detective Arevalos also noted several inconsistencies in what he witnessed at the scene and how Alcorta described the incident. Although Alcorta described a struggle, there was nothing in the bedroom to suggest that a struggle occurred. Based on the medical examiner's report, Detective Arevalos explained the bullet traveled in a slightly downward trajectory. But, Alcorta's

version of events did not match the medical examiner's drawings. Additionally, Alcorta told Detective Arevalos that she was attempting to attend to Bean's wound when the officers arrived. Yet, when she called 911, she reported that she did not know where Bean's wound was located.

During a second interview, Alcorta's description of her use of the chair still did not match the crime scene photographs. Additionally, Alcorta told the detective that she used a stick to block the door from closing, but Detective Arevalos was unable to locate a stick at the scene. Alcorta also claimed that she did not know if the gun was loaded when she went for the gun.

As to the firearm, during her second interview, Alcorta told Detective Arevalos that she did not realize her finger was on the trigger. She acknowledged moving the gun after she dropped it, but did not tell them to where she moved it. This differed from her earlier version when she reported that she dropped the gun, grabbed the phone, and called 911. Finally, Alcorta told Detective Arevalos that she was smashing the headlights on Bean's motorcycle before she pried the garage door open. When asked about the wine bottles sticking out of the wall and on the floor, Alcorta could not provide an explanation.

## B. Medical and Science Witnesses

### 1. Medical Examiner

Bexar County Medical Examiner Kimberly Molina testified that Bean was sixty-four years old, five feet, eleven inches tall, and weighed approximately 230 pounds. She testified the bullet entered the side of Bean's arm, traveled across the arm, creating a larger wound, and then entered his right chest. The bullet did not exit the body. Bean's death was caused by the bullet to his chest. Molina also testified Bean was not intoxicated at the time of his death; she saw evidence of recent, unhealed scratches on his chest, forearm, and right foot. She did not, however, see evidence of powder tattooing, burn marks, stippling, or "evidence of close range shooting where the firearm was discharged in close proximity to the deceased skin."

*2.    Firearms Expert*

David Pendleton, a firearms examiner with the Bexar County Criminal Investigation Laboratory testified the bullet that killed Bean was fired from the .41 Magnum Smith & Wesson, model 58 revolver.  Based on Alcorta's testimony, Pendleton testified the firearm should have a light or "hair trigger" pull.  The first step of his assessment was to determine whether anyone manipulated the firearm after Bean was shot.

Pendleton testified that he had no reason to believe the pistol grip had ever been removed prior to his examination of the weapon.  Additionally, he denied moving the screw or attempting to manipulate the hammer weight on the firearm.  According to Pendleton, if the gun had fired one time, and no one opened the cylinder, he would expect the depressed primer to be in the twelve o'clock position.  But when Pendleton opened the cylinder, it was in the six o'clock position, leading him "to believe that it was at some point opened, or moved in some form or fashion." Pendleton further testified that the firearm was not a "hair trigger;" if it was a "hair trigger" at the time it was discharged causing the death of Bean, it was manipulated before it came to his office.

Defense expert, gunsmith Greg Ferris, testified the grips on the firearm were aftermarket grips.  Ferris also tested the trigger pull mechanism on each chamber.  Ferris examined the strain screw which is used to allow resistance and release of the main spring.  Ferris explained that tightening or loosening the screw "changes the resistance of the hammer in its travels."  He opined the screw "had been backed down at least half a turn" from the factory settings, giving the trigger a lighter trigger pull.

*3.    Forensic Evidence*

Catherine Haskins-Miller, forensic scientist in serology and DNA selection, testified to several blood tests run at the State's request.  Specifically, with regard to the blood swab from the

staircase, she could not exclude Bean as having given the blood sample. In fact, she estimated that Bean was "one in 517 quadrillion, 1 trillion people" that fit the same profile.

## C.    Lay Witnesses

### 1.    *Misty Cruz*

Misty Cruz lived in the house directly to the right of Alcorta's house and her bedroom was on the side closest to Alcorta's residence. Cruz testified she awoke at 12:05 a.m. to a loud noise, a "loud, jarring maybe a clap or a bang type of noise." She then heard three loud bangs, she specifically explained that they did not sound like gunshots. In her opinion, the bangs sounded as though someone was banging on her front door.

Contrary to the timeline provided by Alcorta, Cruz estimated approximately ten to fifteen minutes elapsed between the three bangs and the arrival of law enforcement. She further estimated that approximately ten minutes elapsed between the first loud noise and the three loud bangs.

### 2.    *Eric Joseph Mireles*

Eric Joseph Mireles, Alcorta's twenty-eight year old son, testified he was at his mother's house the night before the shooting and that she told him that she wanted to play in a pool tournament the following night. Mireles left the house about 8:30 p.m.; Alcorta and Bean had already left. After the incident, Mireles testified that his mother told him Bean grabbed the gun first and that she tried to take it away from him. He further testified that his brother brought the sawed-off shotgun into the house, but his mother had taken it away from him.

## D.    Verdict

On June 13, 2016, after five days of testimony, and finding Alcorta guilty of murdering Bean, the jury assessed punishment at fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $10,000.00 fine. On appeal, Alcorta asserts jury charge error and insufficiency of the evidence pertaining to intent to commit murder.

**CHARGE ERROR**

In her first two issues on appeal, Alcorta contends the trial court erred in (1) failing to include the lesser offense of criminally negligent homicide in the jury charge and (2) sua sponte including a definition of self-defense in the jury charge.

## A.    Standard of Review

In resolving a challenge to the jury charge, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, we analyze that error for harm under the applicable standard set out in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh'g). *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If, as here, the defendant did not object to the alleged error at trial, we will reverse only if the error is "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Id*. (quoting *Almanza*, 686 S.W.2d at 171).

Article 36.14 of the Texas Code of Criminal Procedure requires the trial court to deliver a written charge to the jury "distinctly setting forth the law applicable to the case." Certain issues may be forfeited if their inclusion in the charge is not requested. *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013). If the trial court undertakes to charge the jury on a defensive issue, that issue is included in the law applicable to the case. *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998). Otherwise, unless "a rule or statute requires an instruction under the particular circumstances," the defendant must timely request a defensive issue or object to its omission from the charge in order for it to be considered law applicable to the case. *Oursbourn v. State*, 259 S.W.3d 159, 179–80 (Tex. Crim. App. 2008); *see also Williams v. State*, 273 S.W.3d 200, 223 (Tex. Crim. App. 2008) ("[A] party can forfeit the right to complain about the omission of a defensive issue because the defensive issue must be requested before the trial court has a duty to place it in the charge, and so no 'error' occurs absent a request.").

**D.** **Criminally Negligent Homicide**

*1.* *Lesser Included Offense Charge*

Appellate courts apply a two-prong test to determine whether a defendant was entitled to a charge on a lesser-included offense. *See Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993) (en banc); *see also* TEX. CODE CRIM. PROC. art. 37.09 (defining lesser-included offense). First, the lesser-included offense must be included within the proof necessary to establish the offense charged; and, second, the record must show some evidence that would permit a rational jury to find that if the defendant is guilty of an offense, he is guilty only of the lesser offense. *Feldman v. State*, 71 S.W.3d 738, 750–51 (Tex. Crim. App. 2002); *Rousseau*, 855 S.W.2d at 672; *see also Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012) ("First, the court determines if the proof necessary to establish the charged offense also includes the lesser offense. If this threshold is met, the court must then consider whether the evidence shows that if the Appellant is guilty, he is guilty only of the lesser offense.") (citation omitted).

*2.* *Inclusion of Criminally Negligent Homicide*

A person commits criminally negligent homicide if he causes the death of another by criminal negligence. TEX. PENAL CODE ANN. § 19.05(a). The Texas Penal Code defines acting with "criminal negligence" as follows:

> (d) A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*See* TEX. PENAL CODE ANN. § 6.03(d) (West 2011). The offense of criminally negligent homicide "involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his

conduct or the results thereof but fails to perceive the risk." *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005) (internal quotation omitted).

### 3. *Arguments of the Parties*

Alcorta contends the trial court erred in failing to include the lesser-included charge of criminally negligent homicide. The State counters that Alcorta never requested nor objected to the trial court's failure to include a criminally negligent homicide charge.

### 4. *Analysis*

Criminally negligent homicide is a lesser-included offense of murder. *See Jackson v. State*, 248 S.W.3d 369, 371 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Therefore, the only question is whether the jury could have rationally determined that, if Alcorta was guilty, she was guilty only of the lesser-included offense of criminally negligent homicide. *Cavazos*, 382 S.W.3d at 382. The offense of criminally negligent homicide involves inattentive risk creation; that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof, but fails to perceive the risk. *Goodman v. State*, 190 S.W.3d 823, 831 (Tex. App.—Fort Worth 2006, pet. ref'd).

Simply because the defendant did not intend the result does not automatically entitle her to a charge on criminal negligence. *See Wong v. State*, 745 S.W.2d 563, 565 (Tex. App.—Waco 1988, no pet.). "[T]he evidence must establish the lesser-included offense as 'a valid, rational alternative to the charged offense.'" *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (quoting *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)). When raised by the evidence, the trial judge must "instruct the jury on statutory defenses, affirmative defenses, and justifications." *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007) (citing TEX. PENAL CODE ANN. §§ 2.03, 2.04).

The evidence adduced at trial was that "[Bean] was trying to grab the gun . . . I grabbed it, he grabbed it, and it went off." However, the State also presented evidence, and a reasonable jury could have inferred, that (1) Alcorta misled officers regarding the conditions that led to Bean's injuries; (2) Alcorta misled officers about her injuries; (3) Alcorta manipulated the conditions at the residence; and (4) Alcorta moved or changed evidence, including the firearm, the dining room chair, and the wine bottles. To prevail, Alcorta had to present evidence that, although she ought to have been aware of the risk surrounding her conduct or the results thereof, she failed to perceive the risk. *See Goodman*, 190 S.W.3d at 831. However, nothing in the record indicates that Alcorta did not perceive the risk of discharging the firearm. *See Hall*, 225 S.W.3d at 536. We, therefore, conclude the trial court did not err in failing to instruct the jury on criminally negligent homicide. *See Cortez*, 469 S.W.3d at 598.

Accordingly, we overrule Alcorta's alleged charge error regarding the lack of a criminally negligent homicide instruction and turn to whether the trial court's inclusion of the self-defense instruction was in error.

## C.     Self-Defense Instruction

### 1.     *Inclusion of Self-Defense Instruction*

A defendant is entitled to an instruction on any defense supported by the evidence, even if the evidence is weak, contradicted, or lacks credibility. *See Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007). "Self-defense is a justification for one's actions, which necessarily requires admission that the conduct occurred." *Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). In other words, to be entitled to an instruction on self-defense, a defendant must first admit the conduct charged and then offer evidence justifying the conduct. *Id.*

*2.      Arguments of the Parties*

Alcorta contends the trial court erred in submitting the self-defense instruction because she neither admitted committing the offense nor presented evidence on the issue of self-defense. Further, the court's instruction was in direct contradiction to her argument that the shooting was an accident. The State counters that Alcorta not only failed to object to the trial court's charge, but affirmatively endorsed the charge as submitted.

*3.      Charge Conference regarding Self Defense Instruction*

The trial court's proposed charge included a self-defense instruction to which *the State objected* was inappropriate. The trial court defended its inclusion—"there [was] obviously an altercation in this case." Yet, the trial court acknowledged that Alcorta denied "any culpable mental state at all." The trial court further explained,

> Alcorta said that she was in fear for her life; so she raises the issue; she is basically saying that she didn't mean to shoot him, and I didn't even know my finger was on the trigger, she argued that she never intended for any of this to happen, she was in a struggle for her life, and so she didn't even know her finger was on the trigger and the gun just went off.

The trial court reasoned that separating self-defense from Alcorta's other actions was not feasible. The record contained evidence upon which a reasonable juror could believe that every step Alcorta took was in an effort to defend herself. The trial court concluded, "I think it would be a huge, huge error for the Court not to put self-defense in this charge."

Defense counsel replied, "*I agree completely with this Honorable Court.*" (emphasis added).

The trial court reiterated, "I think self-defense goes in this charge." In response to the trial court's inquiry whether the defense wanted any additional changes, defense counsel replied, "No judge, I'm satisfied as it is."

*4.      Harm Analysis*

Assuming without deciding that the trial court erred in including the self-defense charge, because defense counsel not only failed to request a charge on self-defense, but affirmatively told the trial court that Alcorta did not have any objection with the charge as presented by the trial court, Alcorta must show egregious harm. *See Almanza*, 686 S.W.2d at 171.

We assess whether Alcorta suffered egregious harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id*. "Egregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis." *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (internal quotations omitted). "Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Id*. at 490.

Here, the charge properly instructed the jury that the State was required to disprove self-defense beyond a reasonable doubt. The charge contained numerous instructions pertaining to the jury's duty to consider all the evidence in the case. The charge set forth the State's burden to prove the case beyond a reasonable doubt, as well as the jury's duty to acquit if it has a reasonable doubt as to appellant's guilt. Under *Almanza*, the record must demonstrate the appellant has suffered actual, not just theoretical, harm from the erroneous jury instructions. *Id*. Considering the record as a whole, we cannot conclude Alcorta suffered egregious harm from the inclusion of the instruction. We, therefore, overrule Alcorta's issue relating to the trial court's inclusion of the self-defense instruction.

In her final issue, Alcorta contends the State failed to present sufficient evidence of intent to support the jury's guilty verdict.

## SUFFICIENCY OF THE EVIDENCE

### A.    Standard of Review

In reviewing the sufficiency of the evidence, "we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *accord Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). "This standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence. . . ." *Adames*, 353 S.W.3d at 860; *accord Gear*, 340 S.W.3d at 746. The reviewing court must also give deference to the jury's ability "'to draw reasonable inferences from basic facts to ultimate facts.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*. (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We defer to the jury's responsibility to resolve any conflicts in the evidence fairly, weigh the evidence, and draw reasonable inferences. *See Hooper*, 214 S.W.3d at 13; *King*, 29 S.W.3d at 562. The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *See Hooper*, 214 S.W.3d at 15; *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). In conducting a sufficiency review, "[w]e do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision." *Young*, 358 S.W.3d at 801.

**B.     Arguments of the Parties**

Alcorta contends the evidence was insufficient to show that it was her conscious objective or desire to engage in the conduct of grabbing a gun and shooting Bean to death. She further contends the evidence is insufficient to show either Alcorta (1) knowingly caused Bean's death or (2) grabbed the gun with knowledge that her conduct in grabbing the gun was reasonably certain to cause Bean's death.

The State counters the evidence supports that Alcorta and Bean were in a physical altercation that resulted in Bean's death. The State further alleges that Alcorta gave conflicting versions of the events surrounding Bean's death and the evidence is sufficient to support the jury's conclusion that Alcorta intentionally caused Bean's death.

**C.     Evidence of Intent**

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). The State is not required to produce direct evidence of the requisite culpable mental state. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). In fact, the requisite culpable mental state is almost always proved circumstantially. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) ("[M]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). The trier of fact may infer intent from the acts, words, and conduct of the accused. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999). The defendant's actions may show an understanding and common design to do the illegal act, including events occurring before, during, and after the commission of the offense. *See Guevara v. State*, 152 S.W.3d at 50. Circumstantial

evidence will suffice to meet that burden. *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

Alcorta met the officers at the door and reported that she shot Bean. She later told officers that she and Bean were in a verbal argument during a pool tournament that continued throughout the drive home. When she and Bean arrived at the house, she proceeded to lock Bean out of the house. Bean subsequently entered the residence through the garage. Bean was then able to forcibly remove Alcorta from the residence and temporarily lock her in the garage.

The State presented evidence, however, contesting the remainder of Alcorta's version of the events. Alcorta reported that when she regained entry into the residence, Bean prevented her from going up the stairs, and then proceeded to grab her hair, hit her in the face, and used a chair to push her into the floor. Alcorta's appearance, however, did not suggest she had been held down with a chair; and, the chair, about which Alcorta spoke, was in a different location than she described. Additionally, although Detective Arevalos testified Alcorta had bruising on the right side of her face, her description of Bean hitting her in the face should have resulted in bruising on the left side of her face. Alcorta further told officers that once she forced herself loose, she immediately ran upstairs to the bedroom. She reported Bean was able to grab the firearm at the same time Alcorta pulled it from the dresser drawer. Yet, Alcorta's son testified she initially told him that Bean took the firearm and that Alcorta tried to take it from Bean.

Alcorta also told the officer that as she and Bean struggled for the firearm, the gun "went off" and Bean fell backwards. Yet, the medical examiner testified there was no evidence on Bean's body of close range firing. Finally, the firearms expert testified the firearm appeared tampered with indicating the firearm was manipulated after the single shot was fired.

The jury heard all of the evidence; resolution of any conflicts was solely within the jury's purview. *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *Adames*, 353 S.W.3d at 860. The

jury could have rationally resolved the conflicts in the evidence and concluded that Alcorta intentionally and knowingly caused Bean's death. Viewed in the light most favorable to the verdict, a rational juror could have found the essential elements to support a jury finding that Alcorta formed the intent to commit Bean's murder. *See Adames*, 353 S.W.3d at 860; *Gear*, 340 S.W.3d at 746. Accordingly, we hold the evidence is sufficient to support the element of intent.

## CONCLUSION

Having overruled each of Alcorta's issues on appeal, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

DO NOT PUBLISH