**Crystal Gayle LEDBETTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–05–00221–CR.**

Court of Appeals of Texas, Texarkana.

Submitted June 20, 2006.

Decided Nov. 21, 2006.

R. Scott Walker, Marshall, for appellant.

Al Davis, Asst. Dist. Atty., Marshall, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Crystal Gayle Ledbetter[1] was found guilty by a Harrison County jury of capital murder, acting as a party to the offense.[2] The State's evidence showed that, on December 14, 2004, Roger Dale Sanders was stabbed multiple times in the course of being robbed. The evidence further showed that James Box, Ledbetter's common-law husband, had set fire (with Sanders' body inside) to Sanders' truck. Ledbetter's punishment was automatically assessed at imprisonment for life. *See* TEX. PENAL CODE ANN. § 12.31(b) (Vernon Supp.2006). In Ledbetter's initial appeal, in two points of error, she challenges the factual sufficiency of the evidence, and in a third point, she challenges the admission of certain specific evidence. In her supplemental brief,[3] Ledbetter raises two additional issues: that the trial court erred

in overruling an objection to the State's closing argument and that the evidence is legally insufficient to show she is guilty of capital murder, as opposed to murder. We affirm the trial court's judgment.

## I. Factual Sufficiency of the Evidence to Corroborate the Accomplice Witness' Testimony

In her second point of error, Ledbetter contends we should reverse her conviction for capital murder because there is insufficient corroboration of the testimony of the accomplice witness (her common-law husband), James.[4] The State counters that it "went above and beyond" the minimum proof required for corroboration by Article 38.14 of the Texas Code of Criminal Procedure. James' testimony made out a complete case against Ledbetter for her involvement as a party to the murder committed in the course of a robbery.[5]

### A. The Applicable Law and the Standard of Review

■ "A conviction cannot be had upon the testimony of an accomplice unless cor-

1. Although the evidence showed that Ledbetter was also known as "Crystal Box" and "Crystal Gayle Box," and that she sometimes referred to herself as "C. Box," we will refer to her in this opinion as "Ledbetter."

2. Paragraph A of the indictment, as amended, alleged that Ledbetter caused Sanders' death during Ledbetter's robbery of Sanders. We note that the State's evidence at trial concerned whether Ledbetter acted as a party to the capital murder offense, rather than as a principal. However, the indictment's failure to allege Ledbetter acted as a party to the offense, rather than as a principal, is an evidentiary issue that need not be pled in the charging instrument. *See, e.g., Montoya v. State,* 810 S.W.2d 160, 165 (Tex.Crim.App. 1989).

3. On April 6, 2006, Ledbetter's substituted appellate counsel filed a motion for leave to file supplemental brief. The motion did not make clear whether substituted counsel intended to raise new issues in any supplemental brief. The Texas Rules of Appellate Procedure do not contemplate the use of a supplemental brief for the purpose of raising new issues. Nevertheless, in the interests of justice, we will consider the issues raised in Ledbetter's supplemental brief.

4. To avoid confusion, persons involved in this case who share a common last name will be referred to by their first names.

5. We will further detail James' testimony in addressing Ledbetter's first point of error, which challenges the factual sufficiency of the evidence.

roborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). While required by neither common law nor our state and federal constitutions, Article 38.14's codification reflects the Texas Legislature's determination that accomplice-witness testimony implicating another "should be viewed with some level of caution." *Gill v. State,* 873 S.W.2d 45, 48 (Tex.Crim.App.1994); *see also Brown v. State,* 159 S.W.3d 703, 707 (Tex.App.-Texarkana 2004, pet. ref'd), *cert. denied,* —— U.S. ——, 126 S.Ct. 485, 163 L.Ed.2d 369 (2005) (discussing covert witness rule of Article 38.141 and its parallels to Article 38.14's accomplice-witness rule). Article 38.14 requires the corroboration of accomplice-witness testimony, but there is no exact rule as to the amount of evidence required for corroboration. *Dowthitt v. State,* 931 S.W.2d 244, 249 (Tex.Crim.App. 1996). "All that is required is that there be *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Gill,* 873 S.W.2d at 48 (emphasis added); *and cf. Jeffery v. State,* 169 S.W.3d 439, 448 (Tex.App.-Texarkana 2005, pet. ref'd) (applying similar analysis for corroboration of covert witness testimony); *Brown,* 159 S.W.3d at 707–08. Such evidence may be either direct or circumstantial. *Reed v. State,* 744 S.W.2d 112, 126 (Tex.Crim.App.1988).

The test for weighing the sufficiency of corroborating evidence is to eliminate from consideration the accomplice's testimony, and then examine the remaining testimony and evidence to determine if there is evidence that tends to connect the defendant with the commission of the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993); *Reed,* 744 S.W.2d at 125; *Hall v. State,* 161 S.W.3d 142, 149 (Tex.App.-Texarkana 2005, pet. ref'd). The nonaccomplice testimony does not have to directly link the accused to the crime, it alone need not establish guilt beyond a reasonable doubt, and it need not prove all the elements of the alleged offense. *Gill,* 873 S.W.2d at 48; *Munoz,* 853 S.W.2d at 559; *Reed,* 744 S.W.2d at 126; *Jeffery,* 169 S.W.3d at 448. The accused's presence at the scene of the crime is, by itself, insufficient to corroborate an accomplice's testimony. However, "evidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Gill,* 873 S.W.2d at 49; *see also Reed,* 744 S.W.2d at 127; *Jeffery,* 169 S.W.3d at 447; *Brown,* 159 S.W.3d at 708. Moreover, while evidence that addresses only motive or opportunity to commit the crime is, by itself, insufficient to corroborate the accomplice-witness testimony, motive or opportunity evidence may be considered in conjunction with other evidence tending to connect the accused to the crime. *Reed,* 744 S.W.2d at 127. "Cumulative evidence of 'suspicious circumstances' may be sufficient even if none of the circumstances would be sufficient individually." *Jeffery,* 169 S.W.3d at 447; *see also Brown,* 159 S.W.3d at 708. In the end, every case "must be considered on its own facts and circumstances—on its own merit." *Munoz,* 853 S.W.2d at 559; *see also Reed,* 744 S.W.2d at 126.

In this case, Ledbetter admitted she was nearby when James killed and robbed Sanders. Ledbetter, however, denied robbing Sanders or wielding the knife used to kill Sanders. Instead, Ledbetter contends her involvement was limited to fleeing the initial scene of the crime and subsequently helping James destroy other physical evidence.

## B. The State's Witnesses' Testimony, Exclusive of James

The nonaccomplice witness testimony concerning the capital murder charge came from several witnesses, including Ledbetter, herself. We will now turn to the relevant testimony of each of those witnesses to determine if such evidence tends to connect Ledbetter to the underlying crime in a greater sense than her mere presence at the scene of the underlying robbery.

### 1. Allen Peteet

Allen Peteet is the office manager for Texas Scrap and Salvage in Marshall. Peteet testified that a regular customer named "Box" (later identified as James) brought some short iron to the salvage yard December 14, 2004. Peteet paid James for the salvage value of the iron, and James left at 12:45 p.m. James came back two more times that day with "car bodies" to sell. The first of these transactions was completed at 3:27, and the second at 4:22. During each subsequent trip, a woman, whom Peteet identified in court as Ledbetter, came inside to collect payment. This woman had accompanied James to this place of business on other trips, but she usually stayed outside in the truck. When Ledbetter collected the payments for the cars they had brought for salvage on that day, she signed the receipts "C. Box." Peteet described the vehicle in which James and Ledbetter were traveling as a "tri-color pick-up with a gin pole and pulling a trailer."

### 2. Dennis Engdahl

Dennis Engdahl is the fire marshal for Harrison County. He testified that, while investigating this case, he smelled the odor of gasoline or a similar type of burning accelerant coming from the vehicle in which Sanders' charred remains were discovered. Engdahl submitted testing samples from the truck to Armstrong Forensic Laboratory; some of those test results were positive for a type of accelerant.

### 3. Steve Honnoll

Steve Honnoll, an arson investigator for the Harrison County Sheriff's Department, testified he went to Texas Scrap and Salvage and found two cars matching the descriptions of the two vehicles the Sanders family reported stolen. After searching their records, the owners of Texas Scrap and Salvage provided Honnoll with receipts showing who had brought the stolen vehicles to the salvage yard. The name on both receipts was "C. Box." The owners of Texas Scrap and Salvage told Honnoll he should look for James and Crystal Box. The receipts also showed the license plate of a vehicle in which "C. Box" drove away from the salvage yard; Honnoll traced this license plate to a vehicle owned by JoAnn Box (later identified as James' grandmother).

Police officers later received a tip regarding Sanders' murder; this tip prompted them to search the area around the house of James' grandparents, where James and Ledbetter also lived. Using metal detectors, the officers recovered the murder weapon buried six inches below the ground, approximately fifty yards away from the house.

### 4. Chris Dotson

Chris Dotson is an investigator with the Harrison County Sheriff's Department. On the day following Sanders' murder, Dotson found the truck used to tow Sanders' two stolen vehicles to Texas Scrap and Salvage behind the house of James' grandparents. Dotson described this vehicle as a "three-quarter ton Chevrolet, multi-colored, had a gin pole on the back of it and a trailer on the back of the truck." Dotson also located James at that residence. James told Dotson that he, Ledbetter, and

the couple's children had been traveling in that truck the previous day.

### 5. Sonny Albright

Sonny Albright testified he originally met James and Ledbetter through a mutual friend. According to Albright, James came to Albright's house early one evening in December 2004. Ledbetter was with James, and they were in a pickup truck "with a trailer on the back." Albright had a feeling something was wrong because James "had blood on one of his elbows and on his face...." James asked to borrow some of Albright's clothes. Albright told the jury, "I didn't know this guy had done killed somebody and he lied to me about it and said he killed a deer." While James tried to clean up his appearance, Albright observed Ledbetter pacing around as if she were also concerned or troubled about something.

### 6. Dan Reigstad

Dan Reigstad, a physical evidence detective for the Longview Police Department, assisted in the Harrison County Sheriff's Department investigation of Sanders' murder. Reigstad was brought into the investigation to see if he could find any blood evidence in or on the three-quarter ton, multi-colored truck James had been seen driving on the day of Sanders' murder. Reigstad initially identified three potential stains; further testing, however, excluded each as containing any blood. But, most noteworthy of Reigstad's testimony, was his observation about the truck's general condition: though the rest of the truck was "really filthy" (especially the interior), the steering wheel, gear shift, and the driver's seat area had no visible dirt—as if those areas had been recently cleaned.

### 7. Chester Box

Chester Box testified as to the location of his residence and the fact that he lived there with his wife, JoAnn, and that, in December 2004, his grandson, James, and James' common-law wife, Ledbetter, and their children, also lived there. Chester's daughter, Phyllis, lived behind him. Chester further testified that he ran a wrecking yard and that James worked for him, hauling cars. Chester said Ledbetter would usually accompany James when James hauled scrap metal for him. He testified that, on December 14, 2004, he asked James and Ledbetter to haul a load of "short iron" for him to the scrap yard and that they left his place "a little after 11:00." They took their kids with them and were traveling in the same multi-colored three-quarter ton truck previously identified. James and Ledbetter later returned, but left again, continuing to travel in the same vehicle. Chester did not see James again until after 2:00 p.m. the next day when the police officers came to his house looking for him. Unknown to Chester, James was in the back room asleep when the police arrived. Chester thought Ledbetter was at the laundry at the time.

### 8. Phyllis Allen

Phyllis Allen is James' aunt. Before Sanders' murder, James and Ledbetter had lived with Phyllis. Police officers arrived the day after the murder to inspect the multi-colored, three-quarter ton truck parked between Chester's house and Phyllis' house. Phyllis testified that Ledbetter was inside the house at that time. After the police left, Phyllis asked Ledbetter why the police had searched the truck. Phyllis testified Ledbetter responded by admitting she and James "had done something that could take *them* down for life." (Emphasis added.) Phyllis told the jury that, later that day, she saw Ledbetter "clean out the truck" and testified "that is the cleanest I ever seen that truck." Phyllis also saw Ledbetter burn the latter's clothes and other clothes that had been inside the truck. Phyllis further testified

she observed Ledbetter take something out to a neighbor's property. When Ledbetter returned, she admitted to Phyllis that "the evidence" had been buried.

### 9. Chris Allen

Chris Allen is Phyllis' husband. When police first came to Chris' house, he had been outside chopping wood. After they left, Chris saw Ledbetter outside burning something in a barrel. Chris also saw Ledbetter go "to the woods with something she was hiding." According to Chris' testimony, he saw Ledbetter "squat a couple of places . . . and then she picked one spot and started digging it looked like." Chris later talked to Ledbetter about why the police had come to their house. Ledbetter told Chris she was worried about James "cracking and both of them [she and James] going down." Ledbetter also admitted to Chris that she had either burned or otherwise taken care of all of the evidence against she and James.

### 10. Angela Barron

Angela Barron was one of Ledbetter's cell mates at the Harrison County jail. Barron testified that, during their time as cell mates, Ledbetter gradually revealed more and more of the details surrounding her involvement in the Sanders' robbery and murder. Ledbetter admitted to Barron that she and James had initially only planned to rob Sanders. During the robbery, however, James reportedly stabbed Sanders and slit his throat. James and Ledbetter then drove Sanders in his truck to a remote road, poured something inside the truck, and set the truck on fire. Barron also testified that Ledbetter admitted she and James had taken money from Sanders' wallet, which she and James later used to purchase crack cocaine. Then, according to Barron, Ledbetter admitted burning Sanders' clothing, James' clothing, and Sanders' wallet. Ledbetter also reportedly told Barron that she had thrown James' knife into the woods behind the couple's house.

### 11. Valerie Copes

Valerie Copes was another of Ledbetter's cell mates at the Harrison County jail. According to Copes' testimony, Ledbetter told her the details of her crime: "She told me that her and her boyfriend, James Box, had stolen two cars off a gentleman's property and went and scrapped the cars for money so they could buy crack." Then, according to Copes, "[t]hey had a confrontation with the gentleman. . . . She said that the gentleman pulled up and started talking to James about why they had stole[n] his [the victim's] vehicles. . . ." When asked by the State what Ledbetter had told the witness about what else happened during the confrontation, Copes responded, "She said at first James was talking to the gentleman and that when he had gotten out and come around to the driver's side, and—uh—after that he had yelled for her to get in the truck because he had stabbed [the victim]." Ledbetter then reportedly said she and James stole the victim's wallet and some personal items. Copes further testified she was told by Ledbetter that, while Ledbetter and James were robbing Sanders, the latter was still alive.

Ledbetter and James then poured gasoline on Sanders and his truck, and they set Sanders on fire to conceal their crime. According to what Ledbetter reportedly told Copes, Ledbetter and James burned the wallet and other evidence in a pile behind their house, with the exception of the knife used to kill Sanders, which Ledbetter threw into the woods. Finally, Copes testified that Ledbetter told her she was guilty and that "[s]he was just waiting for James to tell the truth."

### 12. Cynthia McClain

Cynthia McClain was the third of Ledbetter's cell mates called by the State to testify against Ledbetter. McClain testified Ledbetter admitted to being involved in the robbery and murder of Sanders. Ledbetter also purportedly said she had helped clean out the truck, had burned the couple's clothes, and had hidden the murder weapon in the woods.

### 13. Crystal Gayle Ledbetter

The final nonaccomplice witness testimony came from Ledbetter herself. Ledbetter admitted she and James had conspired and worked together to steal Sanders' automobiles. It is also clear from her testimony that she and James had purchased crack cocaine with the money they received from selling the stolen vehicles. Ledbetter admitted she witnessed the confrontation between James and Sanders. She also admitted she later saw Sanders' truck burning. But Ledbetter denied setting the truck on fire or being involved in either the robbery or murder of Sanders. Ledbetter further admitted 1) that she and James had twice stopped somewhere to use drugs following Sanders' murder and 2) that she buried the murder weapon.

### C. Was There Sufficient Evidence to Link Ledbetter to the Crime?

■ The testimony of Ledbetter's former cell mates (Barron, Copes, and McClain) individually and collectively linked Ledbetter to the planning, commission, and cover-up of the robbery and murder. Honnoll and Peteet's testimony linked Ledbetter to the underlying robbery, as those testimonies tended to show that Ledbetter was working with James in selling the stolen vehicles and then using those ill-gotten gains to buy illegal drugs. Engdahl's testimony corroborated other evidence suggesting James and Ledbetter had used an accelerant to burn Sanders' truck. (James would later testify he and Ledbetter had set the vehicle on fire.)

Through Dotson's testimony, the State was able to show that the vehicle used by James and Ledbetter to transport Sanders' stolen cars was parked behind the residence where James and Ledbetter lived and that they were together in that vehicle on the day of the killing. Chester confirmed that James and Ledbetter lived with him and that they were together in Chester's truck on the day of the murder.

The nonaccomplice evidence showed both James and Ledbetter went together to Albright's house (confirming James' testimony to such events), where Albright observed blood on James and observed that Ledbetter was unusually nervous, concerned, and troubled. Reigstad's and Phyllis' testimony suggest Ledbetter pursued her "cover-up" efforts by cleaning the truck and by removing incriminating evidence from the truck. Phyllis and Chris corroborated James' testimony that Ledbetter burned and buried this evidence.

After reviewing all the nonaccomplice witness evidence, we conclude there is sufficient evidence to corroborate James' testimony. We, therefore, overrule Ledbetter's challenge to the sufficiency of the nonaccomplice witness evidence in its ability to corroborate the testimony of James, the accomplice witness.

## II. Factual Sufficiency

In her first point of error, Ledbetter contends the evidence is factually insufficient to establish she committed the crime of capital murder as alleged in the indictment.

### A. Standard of Review

■ In a factual sufficiency review, the appellate court views all the evidence in a neutral light and determines whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and

manifestly unjust or whether the great weight and preponderance of the evidence is contrary to the verdict. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *see Watson v. State,* 204 S.W.3d 404, (Tex.Crim.App.2006); *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996).

### B. Factual Sufficiency Analysis

■ Ledbetter argues the evidence is factually insufficient because "no physical evidence was introduced and there were no eyewitnesses absolutely placing Ms. Ledbetter in the direct presence of the body at any time." Ledbetter concedes, however, that James' testimony does indeed place Ledbetter at the crime. James' testimony also goes further: James testified it was Ledbetter who initially suggested the couple steal Sanders' vehicles so they could sell those automobiles for scrap and use the proceeds to buy drugs. James also testified he and Ledbetter tracked down Sanders to retrieve a piece of paper bearing the license plate of the truck in which the couple had been riding when they stole Sanders' automobiles. James had seen Sanders write down this license plate information during an earlier confrontation Sanders had with James and Ledbetter. According to James' testimony, it was Ledbetter's idea to go get this information from Sanders because she feared it contained information that might result in the couple being arrested for the thefts. James further testified that the exchange between he and Ledbetter concerning the piece of paper was as follows:

Q. [State] And what did you tell her?

A. [James] I said all I can do is kill him and get it, because I don't know what to do. I was so high on dope.

Q. What did she do when you told her the only thing you know what to do is kill the man?

A. She said do whatever.

James also testified Ledbetter eventually approached Sanders' truck and stood behind James during James' final confrontation with Sanders. Eventually (according to James' testimony), Ledbetter encouraged James to "[j]ust do it and get it over with"—something Ledbetter reportedly said to James three or four times. In response, James took his knife out (which he had opened up earlier in Ledbetter's presence when the couple had been together in their own truck) and stabbed Sanders. This evidence not only places Ledbetter at the scene, it demonstrates a significant level of involvement in conspiring to kill Sanders as part of the couple's attempt to cover up the earlier thefts.

In her appellate brief, Ledbetter next mischaracterizes the testimony of McClain, Copes, and Barron as merely "confused," lacking "any specifics of exactly what happened," and relevant only as to Ledbetter's "general concern" about the incident while the latter was confined in the county jail. As discussed above, Copes, McClain, and Barron, individually and collectively, testified that Ledbetter had effectively confessed her criminal involvement to her cell mates regarding the accused's participation in the planning, execution, and cover-up of the robbery-murder. Moreover, Ledbetter herself admits she was present at the time of Sanders' murder (going so far as to admit she had even exited the truck during the verbal altercation between James and Sanders that had preceded James killing Sanders), but Ledbetter also testified she played no part in either the robbery or the killing itself. Ledbetter did, however, concede she discussed stealing Sanders' vehicle before any of those thefts actually occurred. She also denied playing any part in the arson of Sanders' vehicle. But, like her other admissions to being involved in the crimes' cover-up, Ledbetter admitted to the jury that she had burned James' clothing and

buried the knife the next day—though she insisted that she did these things at James' behest.

Viewing all the evidence in a neutral light, we cannot say the evidence supporting the jury's verdict is so weak that such verdict is clearly wrong and manifestly unjust or that the great weight and preponderance of the evidence is contrary to the verdict. Accordingly, we overrule Ledbetter's first point of error.

### III. Introduction of Photographs

In her third point of error, Ledbetter contends the trial court abused its discretion by admitting State's Exhibits 12, 13, 55, 57, 58, 59, 60, 61, and 62 (photographs of the deceased) into evidence because, according to Ledbetter, the prejudicial impact of these photographs substantially outweighs the evidence's probative impact.

■■■■ "The admissibility of a photograph is within the sound discretion of the trial judge." *Shuffield v. State,* 189 S.W.3d 782, 786 (Tex.Crim.App.2006). That decision to admit or exclude evidence will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 787. Our rules of evidence favor the admission of all relevant evidence at trial, though these evidentiary rules do provide exceptions that would exclude otherwise relevant and admissible evidence. *See* TEX.R. EVID. 401. One of those exceptions appears in Rule 403 of the Texas Rules of Evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX.R. EVID. 403. When an appellant challenges the propriety of the trial

court's admission of evidence over a Rule 403 objection, an appellate court should consider a number of factors, including:

(1) how probative the evidence is;

(2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;

(3) the time the proponent needs to develop the evidence; and

(4) the proponent's need for the evidence.

*Shuffield,* 189 S.W.3d at 787. The reviewing court should also consider

"the number of photographs, the size of the photograph, whether it is in color or black and white, the detail shown in the photograph, whether the photograph is gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment."✓

*Id.*

State's Exhibits 12 and 13 show the front portion of Sanders' body and face as they appeared following the victim's removal from the burned vehicle. These photographs appear to be four inches by six inches; they also seem to be quite detailed, even in the photocopied versions appearing in our appellate record. Ledbetter objected to the admission of these photographs at trial "to the extent that the prejudicial aspects of these pictures outweigh the probative value." The trial court overruled Ledbetter's objection and admitted the photographs. We will assume State's Exhibits 12 and 13 were admitted at trial as color photographs (even though our version of the appellate record contains only black and white reproductions).[6] Exhibits 12 and 13 show the grue-

---

6. On at least one occasion, the Texas Court of

Criminal Appeals has presumed the at-issue

some appearance of Sanders' body after being badly burned in the arson. These exhibits (especially 13) also show the stab wounds to Sanders' neck. Sanders appears to be clothed in Exhibits 12 and 13. The record does not suggest Sanders' body was positioned before the taking of these photographs so as to enhance their gruesomeness.

State's Exhibits 55, 57, 58, 59, 60, 61, and 62 are photographs of the autopsy of the victim. Ledbetter objected to admission of these photographs based on her belief that the photographs' prejudicial effect would outweigh their probative value, an objection the trial court overruled. Each of these photographs appears to be approximately eight and one-half inches by eleven inches. It is difficult to gauge from the reproductions made a part of our version of the appellate record whether all of these photographs are particularly detailed. It is nonetheless clear that Exhibits 55 and 61 are graphically gruesome close-ups of Sanders' face and neck, and Exhibit 57 is a broader shot of Sanders' clothed, yet badly burned, body. There is no suggestion in the record that the body was positioned before these pictures were taken so as to enhance the autopsy photographs' gruesomeness.

### A. Probative Value

■ Ledbetter first contends these pictures had little probative value because the State had other evidence (specifically, oral testimony) regarding the manner in which Sanders died. Ledbetter suggests the State's case should have been limited to testimony from the medical examiner regarding the cause of death, instead of allowing the State to provide "graphic illustration." Exhibits 12 and 13, while arguably grotesque, are no more gruesome

than the crime scene itself as it was found by the police. *Cf. Shuffield,* 189 S.W.3d at 787. These exhibits also help corroborate, not only the testimony of Engdahl (the Harrison County fire marshal who helped in the investigation), but also part of the later testimony of James in which he stated he stabbed Sanders in the throat. Therefore, we conclude the probative value of Exhibits 12 and 13 was high.

■ Exhibits 55, 57, 58, 59, 60, 61, and 62 are autopsy photographs. They illustrate the various stab wounds Sanders received, as well as the burns Sanders sustained in the vehicle fire. These photographs were admitted during the testimony of the State's forensic pathologist. The pathologist testified the photographs would help the jury in understanding the injuries sustained by Sanders as the pathologist was describing them to the jury. These photographs offer a clearer depiction of Sanders' wounds, especially the stab wounds to Sanders' neck. Therefore, these photographs had at least some probative value in addition to Exhibits 12 and 13 because Exhibits 12 and 13 did not depict these additional wounds.

We conclude the cumulative probative value of Exhibits 12, 13, 55, 57, 58, 59, 60, 61, and 62 was relatively high. These factors weigh in the State's favor.

### B. Potential to Impress the Jury in Some Irrational, but Indelible Way

Exhibits 12 and 13 are graphic, but are no more gruesome than the crime scene itself. Exhibits 55, 57, 58, 59, 60, 61, and 62, which are autopsy photographs, were necessary to explain Sanders' additional injuries that could not be seen in Exhibits 12 and 13. They, too, are graphic, but we cannot say these photographs somehow inject any additional, intangible, or inappro-

---

photographs were submitted in color, despite these photographs appearing only in black

and white within the appellate record. *See Shuffield,* 189 S.W.3d at 787.

priate emotional element into the case such that the trial court should have necessarily excluded these photographs. *Cf. Freeney v. State,* No. AP–74,776, 2005 WL 1009560 (Tex.Crim.App. Apr.27, 2005) (not designated for publication) (still photographs offered greater detail of crime scene and victim's injuries than panoramic view provided by videotape); *and contrast Reese v. State,* 33 S.W.3d 238, 240–46 (Tex. Crim.App.2000) (trial court erred by admitting funeral photograph of victim and her unborn son because photograph was not probative of contested issue). Therefore, we cannot say this second factor weighs in favor of exclusion.

### C. Time Needed to Develop Evidence

The reporter's record shows it took the State six pages of testimony to develop the predicate, to offer for admission, and to discuss the contents of Exhibits 12 and 13. It took the State three pages of testimony from the forensic pathologist to develop the predicate, to offer for admission, and to discuss the contents of Exhibits 55, 57, 58, 59, 60, 61, and 62. Given that the reporter's record contains five volumes of testimony, with three of those five volumes numbering in excess of 160 pages each, and a fourth volume exceeding 100 pages in length, we cannot say the State needed a long time to develop the predicate, to offer for admission, and to discuss the contents of these photographs in front of the jury. This third factor weighs in favor of admission.

### D. The State's Need for the Evidence

In its brief to this Court, the State suggests the now complained-of photographs were necessary to explain and corroborate the forensic pathologist's testimony. We agree. And these photographs do not appear to demonstrate damage to Sanders' body that occurred as a result of an autopsy, rather than wounds sustained during the robbery-murder. The photo-graphs, therefore, served to aid the jury in understanding Sanders' injuries, as well as the general brutality of the crime. As such, this factor favors admission.

### E. Conclusion

Based on our analysis of the applicable law and facts, we cannot say the trial court erred in holding the probative value of these photographs was outweighed substantially by any unfair prejudice to Ledbetter. We overrule Ledbetter's third point of error.

## IV. The State's Closing Argument

■ In her fourth point of error, Ledbetter contends the trial court committed reversible error by overruling her objection to a portion of the State's closing argument. Ledbetter complains that the State made an erroneous statement of law in its closing argument, that her trial counsel objected, and that the trial court erroneously and harmfully overruled this objection.

Neither in the portion of her brief entitled "Statement of Significant Facts" nor in the "Argument" section on this issue has Ledbetter directed our attention to the location in the reporter's record where this alleged erroneous argument occurred. "The brief must contain a clear and concise argument for the contentions made, *with appropriate citations to authorities and to the record.*" TEX.R.APP. P. 38.1(h) (emphasis added). As Ledbetter's brief fails to direct our attention to the location wherein the alleged error occurred, we conclude this issue has been inadequately briefed and overrule it as such. *Cf. Goodman v. State,* 190 S.W.3d 823, 832 n. 5 (Tex.App.-Fort Worth 2006, pet. ref'd) (failure to cite authority and make record references results in jurisdictional and venue issues being overruled as inadequately briefed); *Devine v. Dallas County,* 130 S.W.3d 512,

513–14 (Tex.App.-Dallas 2004, no pet.) (failure to provide single record citation means issues were inadequately briefed).

## V. Legal Sufficiency

 In her final issue, Ledbetter contends the evidence is legally insufficient to support her conviction for capital murder, rather than merely murder. Ledbetter claims the idea to steal evidence of the couple's previous robbery from the victim came at a moment in time that was distinct and separate from James' impulse decision to kill Sanders. In reviewing the legal sufficiency of the evidence, we view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson,* 23 S.W.3d at 7.

 James testified Ledbetter was an active participant in the earlier vehicle thefts. James also testified that, when he was confronted by Sanders about the earlier vehicle thefts, James had originally planned to try and work the situation out by paying Sanders for the vehicles. James approached Sanders' truck and proceeded to talk with Sanders; meanwhile, Ledbetter waited for James in their vehicle. James testified that, after his discussion took longer than Ledbetter had apparently wanted, Ledbetter got out of the truck, walked over to James, and (several times) whispered into his ear, "Just do it and get it over with." James had earlier testified that, before he had gotten out of the truck, he told Ledbetter that the only way he would be able to get the evidence back from Sanders that linked James and Ledbetter to the earlier vehicle theft was to kill Sanders, and that Ledbetter told James to "do whatever."

There was other testimony from Copes and Barron that Ledbetter had admitted to removing personal items from Sanders' body while he was still alive. The jury also heard McClain testify that Ledbetter had admitted to helping James clean out Sanders' truck and burn the victim's clothes following the murder.

Phyllis testified Ledbetter had admitted to her that "she and [James] had done something that could take them down for life." Chris testified Ledbetter had made a statement to him that the latter was afraid James might tell police what happened and cause both her and James to be convicted and imprisoned.

We believe a rational trier of fact could have taken all or parts of the various testimony and rationally concluded that the decision to kill Sanders was part of the larger plot to rob Sanders, that Sanders' murder was done in furtherance of James and Ledbetter's conspiracy to rob Sanders, that Ledbetter was substantially involved in the robbery of Sanders, and that she actively encouraged James to kill Sanders in furtherance of the entire criminal conspiracy. Accordingly, we cannot say the evidence is legally insufficient to support the jury's verdict. We overrule Ledbetter's final point of error.

## VI. Conclusion

For the reasons stated, we affirm the trial court's judgment.