In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00148-CR


______________________________




TOMMY WALTER DARLING, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 8th Judicial District Court


Hopkins County, Texas


Trial Court No. 0518218




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 Tommy Walter Darling appeals his conviction for aggravated sexual assault of a child. This
case was consolidated and tried with three other cases in which Appellant was charged with
aggravated sexual assault of a child and one other case in which he was charged with indecency with
a child. This appeal raises several issues. For the reasons set forth below, we find no reversible error
in this case and affirm the trial court's judgment.

Factual and Procedural Background

 Twelve indictments were returned against Appellant for the charges of aggravated sexual
assault and indecency with a child; the charges involved three different child victims, and the crimes
occurred on several different dates. Two of the three victims were molested in the early and mid-1990s; the third victim was abused in December 2004. Darling initially asked the trial court to sever
each charge from the trial of the others, thereby creating the potential for twelve individual trials. 
See generally Tex. Penal Code Ann. § 3.04 (Vernon Supp. 2008). At the hearing on the severance
motion, Appellant agreed that the early and mid-1990s allegations (involving two different victims)
should be tried together. He did, however, continue to assert that the early 1990s charges should be
tried separately from the 2004 crime. Ultimately, the trial court denied the severance motion in its
entirety and permitted the State to prosecute all twelve cases as part of a single proceeding. 

 Before submitting the case to the jury, the State elected to have only five of the twelve
charges sent to the jury for determination of guilt/innocence. The jury found Appellant guilty of
aggravated sexual assault of a child in four of those cases and guilty of indecency with a child by
contact in the fifth case. After hearing evidence regarding punishment, the jury assessed Appellant's
punishment at imprisonment for life and a $10,000.00 fine on the aggravated sexual assault charges
and at twenty years' imprisonment and a fine of $10,000.00 in the indecency with a child case. 

Denial of Severance Motion

 In his first three points of error, Appellant contends that the trial court erred by failing to
grant his motion to sever the various charges leveled against him (issues 1 and 2) and that he was
unfairly prejudiced by such joinder (issue 3). The State claims Appellant failed to preserve these
precise issues for appeal. Alternatively, the State contends Appellant waived this issue as it relates
to this case. 

 (A) The Severance Statute

 Under certain circumstances, our law permits courts to sever the trials of a defendant facing
multiple charges. The current applicable provision of the Texas Penal Code provides:

 (a) Whenever two or more offenses have been consolidated or joined for
trial under [Penal Code] Section 3.02, the defendant shall have a right to severance
of the offenses.

 

 (b) In the event of severance under this section, the provisions of Section
3.03 do not apply, and the court in its discretion may order the sentences to run either
concurrently or consecutively.

 

 (c) The right to severance under this section does not apply to a
prosecution for offenses described by [Penal Code] Section 3.03(b) unless the court
determines that the defendant or the state would be unfairly prejudiced by a joinder
of offenses, in which event the judge may order the offenses to be tried separately or
may order other relief as justice requires.


Tex. Penal Code Ann. § 3.04. The right to a severance under the current version of Section 3.04
is absolute, except for joinder of sexually based offenses that are governed by Section 3.03 of the
Texas Penal Code. See Scott v. State, 235 S.W.3d 255, 257-58 (Tex. Crim. App. 2007) (analyzing
applicable exceptions to mandatory severance). Section 3.03 concerns sentences for offenses arising
out of the same criminal episode. See Tex. Penal Code Ann. § 3.03 (Vernon Supp. 2008). 
Additionally, if an accused waives that severance right, or if the defendant fails to request a
severance, the joinder and prosecution of multiple indictments in a consolidated trial is permissible. 
Milligan v. State, 764 S.W.2d 802, 803 (Tex. Crim. App. 1989); Johnson v. State, 509 S.W.2d 322,
323 (Tex. Crim. App. 1974). For purposes of whether to sever the trials under the current Texas
Penal Code, the term "criminal episode" means either "the offenses [sought to be joined] are
committed pursuant to the same transaction or pursuant to two or more transactions that are
connected or constitute a common scheme or plan" or "the offenses [sought to be joined] are the
repeated commission of the same or similar offenses." Tex. Penal Code Ann. § 3.01 (Vernon
2003). 

 However, the current version of Section 3.04 applies only to crimes that were committed
after September 1, 1997, the effective date of the current statute. See Act of May 21, 1997, 75th
Leg., R.S., ch. 667, § 3, 1997 Tex. Gen. Laws 2250, 2252 (effective Sept. 1, 1997) (amended 2005)
(current version at Tex. Penal Code Ann. § 3.04). Most of the criminal acts with which the
Appellant was charged occurred before 1997; only one occurred after 1997.

 The prior version of Section 3.04 provided:

 (a) Whenever two or more offenses have been consolidated or joined for
trial under Section 3.02 of this code, the defendant shall have a right to a severance
of the offenses.

 

 (b) In the event of severance under this section, the provisions of Section
3.03 of this code do not apply, and the court in its discretion may order the sentences
to run either concurrently or consecutively.

Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 891 (effective Jan. 1,
1974) (amended 1993, 1997, and 2005) (current version at Tex. Penal Code Ann. § 3.04). This
older version of Section 3.04 applied during the period lasting from January 1, 1974 to August 31,
1997. See id. Additionally, between 1974 and August 31, 1997, Section 3.03 provided, "When the
accused is found guilty of more than one offense arising out of the same criminal episode prosecuted
in a single criminal action, sentence for each offense for which he has been found guilty shall be
pronounced. Such sentences shall run concurrently." Act of May 24, 1973, 63rd Leg., R.S., ch. 399,
§ 1, 1973 Tex. Gen. Laws 883, 891 (effective Jan. 1, 1974) (amended 1993, 1997, and 2005) (current
version at Tex. Penal Code Ann. § 3.04). This prior version of Section 3.04 lacked the sex offense
exceptions to severance that appear in the current statute. Compare Act of May 24, 1973, 63rd Leg.,
R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 891 (amended 1993, 1997, and 2005), with Tex.
Penal Code Ann. § 3.04.

 Appellant now contends a severance for all his cases was mandatory because all but one of
those charges were governed by the pre-1997 mandatory severance version that did not include the
sex-offense exception currently found in Section 3.03. Yet, such argument ignores the fact that
Appellant agreed at trial that the charge in the current case should be tried together with the
remaining charges of aggravated sexual assault, given the close temporal proximity of those charges. 
After making this concession, Appellant's sole remaining objection was to having those cases tried
with the charge of indecency with a child charge stemming from conduct in 2004. 

 By agreeing to the joinder of the four aggravated sexual assault charges, Appellant waived
his first, second, and third points of error with respect to the joint trial of those cases. Thus, the issue
that remains is whether the trial court erred by permitting joinder of the 2004 indecency charge with
the aggravated sexual assault charges. (1) 

 (B) The Trial Court Should Have Severed the Indecency Case from the Other
Charges


 If two or more offenses are joined under Section 3.02, the accused nonetheless has the right
to have separate trials of those offenses. Tex. Penal Code Ann. § 3.04(a). As noted above, and
under the version of the severance statute applicable to Appellant's charges of aggravated sexual
assault of a child (which occurred before 1997), Appellant had an absolute right to have a different
jury determine his guilt in the current case than the jury that determined his guilt in the 2004
indecency case. See Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883,
891 (amended 1993, 1997, and 2005). Accordingly, we conclude the trial court erred by failing to
have the 2004 indecency charge tried separately from the allegations of aggravated sexual assault
of a child. Cf. Llamas v. State, 12 S.W.3d 469, 470 (Tex. Crim. App. 2000) (citing Warmowski v.
State, 853 S.W.2d 575, 581 (Tex. Crim. App. 1993)). 

 "A trial judge's failure to grant a mandatory severance under Section 3.04 is subject to a harm
analysis, and the error is harmless if it did not adversely affect the defendant's substantial rights." 
Scott, 235 S.W.3d at 257 (citing Llamas, 12 S.W.3d at 470; and referencing Tex. R. App. P.
44.2(b)); see also Llamas v. State, 991 S.W.2d 64, 68 (Tex. App.--Amarillo 1998), aff'd, 12 S.W.3d
469 (Tex. Crim. App. 2000). "Substantial rights are not affected 'if the appellate court, after
examining the record as a whole, has fair assurance that the error did not influence the jury, or had
but slight effect." Owens v. State, 135 S.W.3d 302, 310 (Tex. App.--Houston [14th Dist.] 2004, no
pet.); see also Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). "To judge the
likelihood that harm occurred, appellate courts must consider everything in the record including all
the evidence admitted at trial, the closing arguments, and . . . the jurors' comments during voir dire." 
Scott, 235 S.W.3d at 257 (quoting Llamas, 12 S.W.3d at 471); see also Cain v. State, 947 S.W.2d
262, 264 (Tex. Crim. App. 1997) (requiring appellate harm analysis when trial court erred by
denying severance motion). 

 (C) The Severance Denial Did Not Result in Reversible Error

 The record contains significant evidence to support the jury's finding of guilt in this case. 
The indictment alleged that Appellant,

 on or about the 11th day of February, 1992, and before the presentment of this
indictment, in said County and State, did then and there intentionally or knowingly cause the penetration of the sexual organ of . . . a child who was then and [there] younger
than 14 years of age and not the spouse of the defendant, by the defendant's finger.


The named victim in this case (who was sixteen years old at the time of trial) testified that when she
was much younger, she would sometimes spend the night at Appellant's house. She testified that
Appellant would touch her inappropriately at night after she fell asleep. She would wake up during
these assaults, which involved Appellant putting his finger inside her panties, touching her genital
area, and putting his finger inside her genitals. She told the jury that she endured the contact each
time for "a pretty long time." The victim testified that Appellant molested her every time she spent
the night at his house. She eventually made an outcry to her great-grandmother, Jane Green,
regarding the abuse. (2) The victim's testimony made it clear that the abuse occurred more than ten
years earlier, at a time when she would have been younger than fourteen years of age. 

 The jury also heard from the victim's older sister, who was herself molested in the same way
as the victim in this case. (3) This older sister, who was eighteen at the time of trial, testified that when
she was much younger, she would spend the night at Appellant's house. According to her, after she
had gone to sleep in the same bed as Appellant and his wife, Appellant would

 put his fingers -- he would, like, rub his finger around and then put his finger inside
me (sobbing). And sometimes I would move his hand, and he would just put it right
back. And I'd move his hand again and he would just keep on moving it back. We
were wanting him to stop (sobbing). That's what he did whenever we spent the night
over there.


This sister later testified that the molestation by Appellant occurred on more than five different
occasions. One of those occasions occurred when this older sister was but nine years of age, and of
which she offered the following description of events:

 [H]e kept putting his hand, and it was hurting so bad, and I would move his hand, and
he would just put it back, like right back. He would just keep on and on and on, and
he just kept on moving his hand, and I kept on moving it back over to the right, and
he just kept on doing it, kept on doing it. And I just remember wanting him to stop,
because it hurt (sobbing).


The sister later talked to the victim in this case about being molested by Appellant; it was during this
discussion that both girls first learned that the other had been sexually abused in the same way by
Appellant. The two then went to their great-grandmother to tell her about the sexual abuse. 

 Green testified that when the victim in this case would sometimes spend the night at Green's
house, and while the victim was taking her bath, she would sometimes "holler" in pain. Green
explained that the victim later told Green that the hot water made the victim's sexual organ feel as
if it were burning. Green asked the victim to show her the hurting area, and the victim complied. 
Green said the young girl's sexual organ appeared "red, rubbed red, raw-looking." Green initially
thought the victim's inflamed sexual organ was the result of a kidney infection or some other
common illness. But she later learned that those injuries were the result of the victim being sexually
molested by Appellant. The victim was still in kindergarten at the time of this particular incident. 
Green further noted that the victim's older sister had expressed similar feelings of burning and pain
in her sexual organ while taking baths at Green's house. Eventually the victim and her older sister
came to Green in 1995, both telling Green that Appellant had been molesting them. 

 In closing arguments, the State reviewed (1) the evidence supporting Appellant's conviction
in this case, (2) the evidence supporting Appellant's conviction in the second case involving the same
victim, (3) the evidence supporting Appellant's conviction in the two remaining cases in which this
victim's older sister was alleged to have been sexually assaulted, and (4) the evidence that the State
claimed would support Appellant's conviction in the 2004 indecency charge. The thesis of the State's
argument was quite simple: If the jury believed the victims were telling the truth, it should find
Appellant guilty. The State then presented the jury with several arguments as to why it should find
the victims' testimonies to be credible. 

 In his closing argument, Appellant argued that the State had failed to prove its case beyond
a reasonable doubt in each of the five cases. He asserted that merely because the State brought forth
five allegations, such a quantity of accusations did not absolve the State from its burden to bring
forth proof to substantiate each allegation; it was not enough for the jury merely to conclude
Appellant was guilty based solely on the quantity of charges brought forth by the State rather than
on evidentiary merit. 

 While Appellant's closing argument touched on each of the charges and the credibility of the
named victims, he focused primarily on the 2004 indecency charge and the lack of credible evidence
in that specific case. His discussion of the propriety of the aggravated sexual assault allegations was
limited, and he made only a few references as to why the jury should find the victims' testimonies
in those cases to be incredible.

 Finally, while the briefs of neither party directed our attention to any portion of the 315-page
portion of the record for voir dire that would have been relevant to analyzing this issue of harm, (4) we
have independently reviewed the entirety of the voir dire proceedings and have concluded that none
of the jurors' answers during voir dire support the proposition that Appellant suffered harm based
on the trial court's erroneous denial of the severance motion. (5) In fact, all those prospective jurors
who were specifically asked about such during voir dire promised to hold the State to its burden of
proof and not vote to convict Appellant merely because he faced multiple charges within a single
proceeding. Contrast Llamas, 12 S.W.3d at 471-72 (several jurors expressed concern during voir
dire about fact that accused faced multiple charges within single proceeding).

 Therefore, after reviewing the entire record (including all the evidence admitted at trial,
closing arguments from both sides, and voir dire), we can say with fair assurance that the trial court's
erroneous denial of Appellant's motion to sever the older charges for aggravated sexual assault from
the 2004 indecency charge had little (if any) influence on the jury's decision to convict Appellant in
this case. Accordingly, we overrule Appellant's first three points of error. (6)

Solicitation of Testimony that Appellant Had Been Offered a Polygraph Test

 In the only remaining issue relevant to the trial court's judgment in this case, Appellant
contends the trial court erred by permitting both Henry Turner (an investigator with the Hopkins
County Sheriff's Department) and Russell Stillwaggoner (a lieutenant with the Sulphur Springs
Police Department) to testify that Appellant had been offered a polygraph examination. The results
of a polygraph examination are generally inadmissible for any reason because such testing is
inherently unreliable. See, e.g., Robinson v. State, 550 S.W.2d 54, 59 (Tex. Crim. App. 1977); Harty
v. State, 229 S.W.3d 849, 851 n.2 (Tex. App.--Texarkana 2007, pet. ref'd).

 Appellant admits that the witnesses never used the word "polygraph" to describe the testing
offered. He does, however, argue that the State's line of questioning allowed the jurors to infer
Lieutenant Stillwaggoner had offered a polygraph or similar "lie detector" test to the Appellant,
which was improper. 

 In this case, none of the witnesses ever used the word "polygraph" or the phrase "lie detector
test" to describe the "additional scientific testing" that was ostensibly offered to Appellant. Nor did
any of the witnesses affirmatively testify that Appellant refused to take such a polygraph
examination. Nor did the State seek to admit the results of this nonexistent polygraph examination. 
And it is at least possible that given the context of the testimony, the trial court could have concluded
these witnesses were referring to any other of a various assortment of scientific testing such as DNA
testing, X-ray testing, or blood glucose testing. To presume anything more based on the appellate
record would require us to resort to the rankest of speculation. Accordingly, we cannot say the
record before us supports the conclusion that the trial court abused its discretion. We overrule this
point of error.

Conclusion

 Appellant raises no other issues that are relevant to the trial court's judgment in this case.
Accordingly, for the reasons stated, we conclude Appellant has not demonstrated that reversible error
occurred in the trial of this case. 

 We therefore affirm the trial court's judgment.




 Bailey C. Moseley

 Justice


Date Submitted: April 2, 2008

Date Decided: August 13, 2008


Publish
1. We remind all trial courts that they must make a special effort to carefully review severance
motions in all cases involving multiple charges of sexually based offenses. These specialized
motions require an intensive review of the allegations involved. Trial courts would be wise to use
the offense date(s) alleged in the indictment(s) to identify correctly the applicable severance law(s)
in effect on the date of that alleged offense. And both sides of the bar must provide the bench with
better assistance in identifying and applying the applicable severance statute(s). Such concerted
effort by all parties will benefit the bench, the bar, the victims, and the trial witnesses by hopefully
decreasing the likelihood that the trial court is led perilously close to the abyss of reversal through
an inadvertent--but nonetheless erroneous--joinder.
2. Though the great-grandmother timely reported this outcry of abuse, state officials in 1995
did not, for whatever reason, take subsequent steps to investigate and/or prosecute the Appellant.
3. Two of Appellant's companion appeals concern convictions for aggravated sexual assault
of a child wherein the named victim was this older sister.
4. See Tex. R. App. P. 38.1(h) (appellant's brief must contain appropriate citations to record),
38.2 (same); Ledbetter v. State, 208 S.W.3d 723, 735-36 (Tex. App.--Texarkana 2006, no pet.).
5. During voir dire, the State asked the prospective jurors to require the State to prove each
charge beyond a reasonable doubt and to not convict Appellant merely based on the quantity of
charges. None of the prospective jurors said they would lessen the State's burden merely because
Appellant faced multiple charges of sexually based offenses. 
6. Cf. Scott, 235 S.W.3d at 259-61 (no allegation defensive strategy would have been different
absent improper joinder; different juries would have likely learned of extraneous conduct anyway);
Husley v. State, 211 S.W.3d 853, 858 (Tex. App.--Waco 2006, no pet.) (record did not demonstrate
harm inasmuch as appellant's defense to each charge was same: that victim was lying).



ght: 0.416667in">          Bethany called Darren Kirkwood, incarcerated for prohibited sexual contact. 
Kirkwood said he also had been in the Cass County jail with Bethany and Lynch, when
Bethany said to Lynch, "You killed Randy Wiggins just like you did Donald Scruggs." 
According to Kirkwood, Lynch shook his head indicating "yes" and apologized, then walked
away. 
          Martel McQuery, in prison for driving while intoxicated, said he was present at a
conversation between Lynch and Bethany in the Cass County jail. McQuery said that he
heard Lynch say he was sorry for getting Bethany in trouble and that it was Lynch's "fault
[Bethany] was in all this," to which Bethany said, "You ought to go ahead and tell these
people what's right." McQuery said Lynch "just confirmed and shook his head." 
          Bethany testified in his own defense. He denied killing Randy. He said that Tammy
was pregnant with his child at the time of Randy's murder and that a few days before the
murder, Tammy asked Bethany to kill Randy, saying, "[I]f you won't kill Randy, I'll find
someone else to do it or do it myself." Bethany admitted this was said in a car in the
presence of Miller and Fish while they were taking Tammy back to Randy's house. 
Bethany said that, after Tammy was dropped off, he told Miller and Fish he would never
"kill any man for any woman for any reason." 
          To explain his bloody appearance when he arrived at Ernie's house, Bethany, an
admitted car thief, testified he had been scouting vehicles to steal that were parked on
parking lots in Shreveport, Louisiana. He said an intoxicated individual at one of the
parking lots accused him of looking at his wife and started a fight with him. Bethany
testified this man's wife hit him in the face with a beer bottle. Although this blow did not
break the skin, it did cause a bloody nose. He testified his nose bled profusely as he drove
back to Ernie's house, where he showered and put his bloody clothes in a garbage bag. 
Bethany said he put the garbage bag in the stolen blue Ford he had been driving. He
could not account for what happened to it after that. 
          Bethany admitted taking Gaspard's Ford truck, with the toolbox in back, to Frierson,
Louisiana, and burning it. He said that, as he left Ernie's house in Shreveport, he
coincidentally ran into Lynch, who was driving Gaspard's champagne-colored F150. Lynch
asked him to trade the champagne Ford's radio and the tools in the back of that truck to
Ernie for methamphetamine. Bethany testified Lynch gave him the title to Randy's Lincoln
at this time, as partial payment for other methamphetamine Bethany had previously
secured for Lynch from Ernie. Lynch and Bethany traded trucks because, according to
Bethany, Lynch had just stolen the champagne Ford in Texas and did not want to drive it
back to Texas. When Lynch gave him the truck, Bethany noticed blood in the bed and in
the toolbox under a leather jacket. Fearing that Tammy and Lynch had killed Randy and
that his possession of the truck could implicate him, Bethany decided to burn the truck and
thereby destroy any evidence that could implicate Tammy. Bethany was concerned for
Tammy's well-being and that of his child, whom she carried.


 
          Bethany, previously convicted of unauthorized use of a vehicle in Louisiana, claimed
to be a master car thief. He testified he wanted Tammy to obtain the title to a Lincoln car
owned by Randy because Bethany had access to another Lincoln. With the title to Randy's
Lincoln, Bethany could substitute vehicle identification numbers and alter the titles, making
the newer Lincoln, which Bethany was sure he could steal, safely transferable. Bethany
had been asking Lynch for the title for some time, and eventually told Tammy she should
get the title for him as she "owe[d] him that much." He said that statement referred to
debts owed Ernie for methamphetamine Bethany had acquired for Tammy and himself. 
Bethany also testified he had tried to get the title from Lynch to pay for drug debts incurred
by Bethany for drugs acquired on Lynch's behalf. 
No Error in the Single Application Paragraph of the Court's Charge
          Bethany complains about the trial court's charging the jury in the disjunctive with
regard to how he committed capital murder. The Penal Code provides that a person
commits capital murder when, among other ways, such person "intentionally commits the
murder in the course of committing or attempting to commit . . . robbery . . ." or "commits
the murder for remuneration or the promise of remuneration or employs another to commit
the murder for remuneration or the promise of remuneration." Tex. Pen. Code Ann.
§ 19.03(a)(2), (3) (Vernon Supp. 2004–2005). 
          The indictment in this case alleged Bethany committed capital murder:
on or about the 17th day of March, A.D. 2001 . . . [when he] knowingly and
intentionally cause[d] the death of . . . Charles Randall Wiggins, by hitting
[Wiggins] in the head with a hammer and stabbing [Wiggins] in the throat
with a knife, . . . and . . . [Bethany] . . . did then and there cause the death of
[Wiggins] for remuneration and the promise of remuneration . . . .

          The second paragraph of the indictment likewise charged Bethany with capital
murder when "in the course of attempting to commit and committing robbery of [Wiggins],
[Bethany] did then and there intentionally and knowingly . . . murder . . ." by hitting Wiggins
in the head with a hammer and stabbing him in the neck with a knife. 
          The trial court's charge to the jury read, in pertinent part:
if you either believe from the evidence beyond a reasonable doubt, that on
or about March 17, 2001 . . . the defendant, Glen Allen Bethany, Jr. did then
and there intentionally and knowingly cause the death of . . . Charles Randall
Wiggins, by hitting [him] in the head with a hammer and stabbing [Wiggins]
in the throat with a knife, . . . for remuneration and [sic] the promise of
remuneration from Tammy Wiggins, . . . or if you believe from the evidence
beyond a reasonable doubt, that on or about the17th day of March, 2001 . . .
[Bethany], in the course of attempting to commit and committing robbery . . .
did then and there intentionally and knowingly commit murder by causing the
death of . . . [Wiggins] by hitting [Wiggins] in the head with a hammer and
stabbing [Wiggins] in the neck with a knife . . . you will find the defendant,
Glen Allen Bethany, Jr., guilty of capital murder as charged in the indictment. 

The jury returned a verdict stating, "We, the Jury, find the defendant, Glen Allen
Bethany, Jr., guilty of the offense of CAPITAL MURDER, as charged in the indictment."
          Bethany made no objection to the court's charge before it was read to the jury. He
claims, however, that error in the charge cannot be waived. To an extent he is correct; we
first examine the record to determine whether any error occurred. If there is error, the
preservation or lack thereof determines the harm analysis we must conduct. See Grider
v. State, 139 S.W.3d 37, 38–39 (Tex. App.—Texarkana 2004, no pet.). We first address
whether there was error in the trial court's charge.
          Our disposition of this point is controlled by Kitchens v. State, 823 S.W.2d 256 (Tex.
Crim. App. 1991). There, the Texas Court of Criminal Appeals held that, "It is appropriate
where the alternate theories of committing the same offense are submitted to the jury in
the disjunctive for the jury to return a general verdict if the evidence is sufficient to support
a finding under any of the theories submitted." Id. at 258, citing Aguirre v. State, 732
S.W.2d 320, 326 (Tex. Crim. App. [Panel Op.] 1987) (op. on reh'g). 
          The instant case is analogous to Kitchens; the scenario is almost identical. Kitchens
was also charged with capital murder, alleged to have been committed by causing the
death of the victim by shooting or strangling the victim while committing robbery or sexual
assault. The jury was charged with these alternative means of committing the crime in a
single application paragraph. Id. at 257 n.1. As described above, a single application
paragraph was likewise submitted to the jury in the instant case. 
          Bethany attempts to distinguish Kitchens by saying that Kitchens is "bad law"
because that case relied on the United States Supreme Court's plurality decision in Schad
v. Arizona,


 yet the Kitchens decision failed to conduct a "meaningful (let alone critical)
analysis" of Schad. 
          Schad was charged in Arizona with murder, premeditated, or committed in the
course of committing or attempting to commit a felony. The United States Supreme Court
held that the mens rea necessary to prove both premeditated murder and felony murder
had been interpreted by the Arizona Supreme Court to bear the same "species of the
blameworthy state of mind required to prove a single offense of first-degree murder" and
that such an analysis "finds substantial historical and contemporary echoes." Schad, 501
U.S. at 640. 
          "Plainly there is no general requirement that the jury reach agreement on the
preliminary factual issues which underlie the verdict." Id. at 632, quoting McKoy v. North
Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring). "[I]t has long been the
general rule that when a single crime can be committed in various ways, jurors need not
agree upon the mode of commission. That rule is not only constitutional, it is probably
indispensable in a system that requires a unanimous jury verdict to convict." Id. at 649–50
(Scalia, J., concurring) (citations omitted).  
          In support of his argument that this case is distinguishable from Kitchens, Bethany
cites Ngo v. State, 129 S.W.3d 198 (Tex. App.—Eastland 2004, pet. granted). We note
that, since Bethany filed his brief, the Texas Court of Criminal Appeals has granted review
of this case. Ngo was convicted of credit card abuse. He was indicted in three separate
paragraphs charging credit card abuse. The first paragraph charged Ngo with knowingly
and intentionally stealing a credit card; the second paragraph alleged he had knowingly
and intentionally received a credit card with the intent to use it, knowing it had been stolen;
and the third paragraph charged Ngo with using and presenting a credit card with the intent
to obtain a benefit fraudulently and with the knowledge that such use was without the
effective consent of the cardholder. Id. at 200. 
          The charge in Ngo's trial stated:
 
Now, if you find from the evidence beyond a reasonable doubt that
[appellant] on or about the13th day of December, 2002, did then and there
unlawfully, intentionally or knowingly steal a credit card owned by the card
holder, Hong Truong, with intent to deprive the cardholder of the property
and without the effective consent of the cardholder; or

If you find from the evidence beyond a reasonable doubt that [appellant] on
or about the 13th day of December, 2002, did then and there unlawfully and
knowingly receive with intent to use a credit card owned by card holder,
Hong Truong, knowing the credit card had been stolen; or

If you find from the evidence beyond a reasonable doubt that [appellant] on
or about the 13th day of December, 2002, with intent to obtain a benefit
fraudulently, did use or present to Hanh Nguyen a credit card knowing the
use was without the effective consent of the cardholder, Hong Truong,
namely without consent of any kind, and knowing that the credit card had not
been issued to the defendant, then you will find [appellant] guilty as charged
in the indictment.

Id. at 200 n.2. The Court of Appeals in Eastland reversed the conviction, finding that each
of the paragraphs in the indictment charged a distinct crime, and that the disjunctive used
in a single application paragraph was error, because credit card abuse committed by using
or presenting a credit card without the effective consent of the owner, stealing a credit card,
or receiving a credit card with intent to use the same knowing the card was stolen, were
three distinct crimes. Id. at 201. The court pointed out that the elements of credit card
abuse are different in Sections 32.31(b)(1) and 32.31(b)(4) of the Texas Penal Code. Id.
          Bethany also cites Francis v. State


 in support of his claim that the disjunctive
charging of alternative means of committing capital murder was error. There, the state
presented evidence of four incidents of indecency with a child by Francis: two incidents
involved touching the victim's breast; two involved touching the victim's genitals. The
charge (following the defense's motion for the state to elect) instructed the jury Francis
could be found guilty if he were found to have "engage[d] in sexual contact by touching the
breast or genitals of [the victim]." Francis, 36 S.W.3d at 124. Citing Vernon v. State,


 the
Texas Court of Criminal Appeals held the two incidents of sexual contact were distinct
criminal acts and not properly charged in a single disjunctive application paragraph. 
Francis, 36 S.W.3d at 124. 
          As noted in the Francis opinion, Kitchens and Schad, as well as the instant case all
involved the commission of one crime: the murder of one individual. Francis and Ngo
involved commission of distinct crimes on separate occasions. Kitchens is completely on
point in this case. One crime—capital murder—was committed by Bethany. Even more
to the point, whether Bethany committed murder for remuneration (or the promise of
remuneration) or committed murder in the course of robbing Randy, the remuneration
sought and the fruits of the robbery were the same: the title to Randy's Lincoln. In light
of the similarities between this case and Kitchens, and the pending review of Ngo, we find
Kitchens controlling. 
          No error occurred with regard to the court's charge in the instant case. Accordingly,
it is not necessary to conduct a harm analysis. See Almanza v. State, 686 S.W.2d 157,
172 (Tex. Crim. App. 1984) (op. on reh'g); Grider, 139 S.W.3d at 38–39.
The Evidence is Factually Sufficient to Support the Jury's Verdict 

          In reviewing the factual sufficiency of the evidence, we are required to determine
whether, considering all the evidence in a neutral light, the jury was rationally justified in
finding guilt beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim.
App. 2004).
          The evidence, viewed in a neutral light, is not too weak to support the jury's finding
of guilt beyond a reasonable doubt. Nor can we say, when weighing the evidence
supporting and contravening the conviction, that the contrary evidence is strong enough
that the State could not have met its burden of proof. 
          Bethany arrived, by his own admission, at Ernie's house late at night covered in
blood, yet showing no visible injuries. He was asked, in the hearing of two testifying
witnesses, to kill Randy and claimed responsibility for doing so to several people. In his
admissions to Miller and Bunn, days after the murder, he gave details not released on
television news reports. He admitted to at least four people (Miller, Bunn, Smith, and
Mounts) that he drove Gaspard's truck to Frierson, Louisiana, and burned it. His watch and
shoes were found in the burned hull of the stolen pickup. The Tommy Hilfiger shoes he
admitted owning (but denied wearing on the night of the murder) had Randy's blood on
them, and their soles strongly resembled the imprints found at the scene of the murder. 
Bethany's watch, found in the burned truck, had Randy's blood on it.


 His girlfriend,
Tammy,


 was friends with the wife of the owner of the stolen truck, which provided
Bethany with knowledge of the truck, its large toolbox, and the owner's propensity for
leaving the keys in the ignition. Bethany admitted being an accomplished car thief. He
also admitted having an ongoing affair with Tammy and claimed she carried his child. The
title to Randy's Lincoln was found in Bethany's wallet, and he had been heard on more
than one occasion to have said he wanted that title. He even admitted this in his testimony
and described how he planned to use that title in stealing another (presumably newer)
Lincoln. Considering all the evidence in a neutral light, the jury was rationally justified in
finding guilt beyond a reasonable doubt.
          Other than slight discrepancies in testimony when compared to citations from the
previous trial, the only contrary proof was that of other witnesses saying they had heard
that Lynch had confessed to killing Randy, or that Lynch had apologized to Bethany for
getting him "in all this trouble," or that he was having to go through all this, and Bethany's
own denials, which the jury was free to accept or reject. Passmore, McQuery, and
Kirkwood were all prison inmates, and the jury was free to weigh their credibility and
testimony. When weighing the evidence supporting and contravening the conviction, the
contrary evidence is not so strong for us to determine the State could not have met its
burden of proof.  
          The evidence is factually sufficient to support the jury's verdict, and Bethany's
second point of error is overruled.
          We affirm the judgment.



                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      October 27, 2004
Date Decided:         November 18, 2004

Publish